# IN THE SUPREME COURT OF IOWA

No. 13–1965

Filed March 28, 2014

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

      Complainant,

vs.

**RONALD L. RICKLEFS,**

      Respondent.

_____

On review of the report of the Grievance Commission of the Supreme Court of Iowa.

Grievance commission recommends a thirty-day suspension of attorney's license to practice law. **LICENSE SUSPENDED.**

Charles L. Harrington and David J. Grace, Des Moines, for complainant.

Ronald L. Ricklefs, Cedar Rapids, pro se.

**MANSFIELD, Justice**.

This matter comes before us on the report of a division of the Grievance Commission of the Supreme Court of Iowa. *See* Iowa Ct. R. 35.10. The Iowa Supreme Court Attorney Disciplinary Board (Board) charged that the respondent, attorney Ronald L. Ricklefs, violated several of our ethical rules by failing to maintain proper trust account records, commingling funds, and misrepresenting his trust account practices on his client security questionnaire. After hearing the matter, the commission found most of the alleged violations had occurred and recommended a thirty-day suspension. Upon our consideration of the commission's findings of fact, conclusions of law, and recommendation, we determine that all but one of the alleged violations took place. Giving particular consideration to Ricklefs's failure to rectify his trust account problems despite a prior audit four years before, we suspend his license to practice law with no possibility of reinstatement for three months.

## I. Factual Background.

Ricklefs was admitted to practice law in Iowa in 1978. He is currently sixty-one years old and works in Cedar Rapids as a solo practitioner.

This case centers on a routine audit performed by the Client Security Commission on Ricklefs's client trust account and accounting records in 2012. The audit showed noncompliance with our rules. Even more worrisome, many of the same deficiencies had been uncovered in an audit four years earlier and had been pointed out to Ricklefs, but Ricklefs had not corrected them. We therefore begin our discussion with the prior 2008 audit.

**A. The 2008 Audit.** On September 13, 2007, Thomas W. McGarvey, an auditor with the Client Security Commission, contacted

Ricklefs by phone. McGarvey attempted to set up an appointment with Ricklefs on that day or the following day to conduct an audit of his client trust account. Ricklefs said he was not available those days but proposed meeting late the following week. McGarvey said his schedule did not permit that, but indicated he would return to Cedar Rapids in October and contact Ricklefs at that time to set up a meeting.

Accordingly, McGarvey called Ricklefs on October 10 and proposed a meeting on either October 17 or 18. Ricklefs did not respond, so McGarvey placed a second call on October 15 and insisted the meeting needed to take place on October 19. Late in the afternoon of October 18, Ricklefs attempted to reschedule. He indicated his recent transactions had not been recorded and also claimed he was sick and likely to be out of the office the following day. Ricklefs asked McGarvey to allow him to submit the needed documents by mail no later than October 31.

McGarvey agreed to this plan but proceeded to interview Ricklefs regarding his accounting practices during the October 18 telephone call. Ricklefs told McGarvey he had reconciled his bank statements with his trust account "from time to time" and also said his client ledgers were reconciled to his trust account balance "in some fashion."

McGarvey followed the phone call with a formal written request for documents on October 23. Ricklefs failed to provide the documents by the agreed-upon October 31 deadline. Therefore, McGarvey followed up with a second request for the documents on December 28. He also asked Ricklefs to explain why he had not provided the documents by the original deadline. Again, Ricklefs failed to respond.

On April 23, 2008, McGarvey contacted Ricklefs by telephone and requested to meet with him at Ricklefs's office on April 24. Ricklefs indicated he was not ready for McGarvey's visit and his records were not

up to date. He also claimed he would be in depositions. After McGarvey informed Ricklefs he was not in compliance and insisted on meeting with him within ten days, Ricklefs consented to a May 1 meeting.

In the course of this audit, Ricklefs provided some client ledger cards. However, it became clear that Ricklefs had been writing numerous checks on his client trust account to cover personal expenses, including payment of his rent and utilities, payments to his mother, and payments for medical services. Ricklefs explained that these payments were made out of earned funds or personal funds he had deposited into the trust account. Ricklefs declined to answer when asked whether he had a personal checking account. In any event, McGarvey concluded that Ricklefs had been commingling client and personal funds. McGarvey shared this finding with Ricklefs and provided him with a copy of the trust account rules. McGarvey also turned in his audit report to the Client Security Commission, but apparently no action was taken on it at that time.

**B. The 2012 Audit.** In October 2011, Charles Brinkmeyer, another auditor with the Client Security Commission, stopped at Ricklefs's Cedar Rapids office to try to conduct another routine audit of Ricklefs's client trust account records. Brinkmeyer was unsuccessful in scheduling an audit that day and was provided with a myriad of excuses from Ricklefs over the following weeks. Following multiple trips and phone calls to Ricklefs's office, Brinkmeyer insisted on meeting with Ricklefs no later than February 9, 2012. Ricklefs finally agreed to that date, and the meeting was set.

Brinkmeyer performed an initial interview and completed part of the audit during the February 9 meeting. However, he was unable to

conduct a meaningful review because of Ricklefs's failure "to prepare or maintain most of the required records."

Ricklefs had not regularly retained trust account bank statements. Ricklefs acknowledged he did not have all the statements and had to contact the bank to get them. Ricklefs also admitted he did not maintain a check register. Instead, he produced a blank register and told Brinkmeyer he was willing to begin using it immediately. Brinkmeyer observed that Ricklefs had retained only carbon copies of checks and deposit slips in place of a proper checking account register.

For his client ledger, Ricklefs produced only a single page for a single client, showing a $300 deposit made by that client on September 26, 2011. No other activity was shown for that client, and the ledger still reflected the existence of the $300 balance as of the date of the audit. Brinkmeyer concluded from his discussions that Ricklefs had not prepared client ledger pages on a regular basis and the single page provided had been prepared only recently.

Brinkmeyer determined it would be impossible for Ricklefs to perform any required monthly reconciliations without the bank statements or a check register. Despite Ricklefs's claim that he did monthly reconciliations, the reconciliations attempted by Ricklefs were "not correct in either form or end result," and Brinkmeyer noted it was "apparent he is not in the habit of preparing" the reconciliations. In the audit report, Brinkmeyer stated he believed "the entries on the six statements provided to me today reflect his first-ever efforts to complete such reconciliations."

Even though the client ledger detail showed only a $300 balance and Ricklefs claimed in the initial interview that his trust account contained only client funds, his trust account had an actual balance of

$2243.66. Ricklefs asserted the excess funds were money he had earned and not yet removed from the account. However, he could not provide documentation showing where the funds had originally come from.

As a result of the February 9, 2012 review, Brinkmeyer enumerated a long list of deficiencies:

(1) Failure to retain client trust account bank statements[,]

. . . .

(2) Failure to maintain a separate client trust checking account (commingling of funds is apparent),

(3) Failure to maintain a check register,

(4) Failure to complete and maintain monthly 3-way reconciliations,

(5) Failure to maintain client ledger account detail,

(6) Failure to satisfactorily identify or explain the source of the "excess" amount in his trust account (bank statement vs. the client ledger balance as presented to the auditor)[.]

When Ricklefs signed Brinkmeyer's audit statement, Brinkmeyer also requested "preparation and maintenance of a check register, reconstruction of a client ledger for at least the most recent six months, and that the attorney provide those documents to [him] no later than March 31, 2012." However, that deadline passed without Ricklefs providing the additional information.

Ricklefs finally contacted Brinkmeyer via email on April 17, apologized for the delay, and provided a five-page handwritten document entitled "RLR Trust Account Check Ledger." The document appeared to be a reconstruction of the check register without the required six-month reconstruction of a client ledger. Brinkmeyer responded and called attention to Ricklefs's failure to provide all of the requested information. He commented on Ricklefs's continued practice of commingling client

funds with personal funds and expressed the importance of maintaining separate accounts. Additionally, Brinkmeyer provided Ricklefs with a copy of Iowa Court Rules chapter 45, advised him to become familiar with the court rules, and told him to properly "reconstruct all client trust records as required by the Rules, including the check register, client ledger, and monthly reconciliations for at least the period of July 1, 2011 to the present." Ricklefs was given a sixty-day deadline to respond to the request and to set a time to meet with Brinkmeyer again.

When the sixty-day deadline passed without a response from Ricklefs, Brinkmeyer emailed him on July 2, 2012, and asked for a response by the end of business on July 6. Brinkmeyer indicated that if a response was not received, he would forward his audit file for possible referral. Ricklefs responded via email on July 5 and attached a new document entitled "RLR Trust Account general ledger update" and several bank statements. Ricklefs's submission appeared to be information that would be contained in a check register and was dated from March 9, 2012, through June 1, 2012. However, an additional page provided similar, but overlapping, information from May 11, 2012, through June 19, 2012, and seemed to have been created from a bank statement rather than contemporaneously.

Ricklefs's email also contained information about the balances attributable to two clients, while explaining no other client money was being held. Several names in the check register that appeared with deposits did not match the names of any clients Ricklefs had previously disclosed to Brinkmeyer. The monthly reconciliations and historic client ledger pages were, once again, not provided.

Brinkmeyer responded to Ricklefs in a lengthy email on July 19. He reminded Ricklefs that some requested information was still missing.

In addition, he requested additional information about unclear entries on the check register for both expenses and deposits. Ricklefs was advised to provide evidence that he had ceased commingling funds and had completed a formal separation of the trust account funds from all other funds. Brinkmeyer also informed Ricklefs that he had reviewed the reports from Ricklefs's 2008 audit and was therefore "well aware of his records issues from that time." He stated it was apparent that Ricklefs had "not attempted to improve either [his] record-keeping or [his] trust account practices" since the 2008 audit. He went on to state he had been very lenient with Ricklefs, allowing him more time than necessary to provide the requested information and prepare the proper records. Ricklefs was asked to reply promptly and give the matter his immediate attention.

Ricklefs still had not responded to Brinkmeyer's email on July 25, 2012. At that time, Brinkmeyer sent a message to the director of the Office of Professional Regulation that outlined the problems with Ricklefs's records and the numerous delays experienced during his attempts to audit Ricklefs's files. He indicated that he believed Ricklefs had "done nothing to improve his practices or record-keeping" since the 2008 audit. He noted the same delay tactics used with McGarvey in 2008 had been employed again. As a result, he requested the Office of Professional Regulation "consider issuance of a 15-day notice and/or referral" of Ricklefs "due to his failure to properly prepare or maintain client trust account records as required, and continuing delays in providing requested information."

Following Brinkmeyer's email, a delinquency notice was sent to Ricklefs by the Client Security Commission on August 7, 2012. Ricklefs responded to the commission by letter on August 22. In it, he indicated

he had contacted Brinkmeyer and supplied him with additional documents as instructed. He also noted he was "in the process of reducing the trust account balance" to include only client funds and a limited amount of personal funds "to avoid a zero balance."

Ricklefs went on to assert that his commingling of funds had stemmed from financial problems related to unpaid medical bills from an emergency surgery in 2005. He explained his personal bank account had been "executed upon approximately seven years ago." Since then, he was concerned that any account he established for himself would be vulnerable to garnishment, and he currently had no personal or business bank accounts. Ricklefs also said he had no vehicle. Because he had no business or personal bank account and "limited mobility," Ricklefs said he "occasionally lacked means by which to process checks drawn upon non-local accounts." Ricklefs added that he commonly made payments to his mother to reimburse her for the use of her credit card and to pay her for past advances. Because he was now using his mother's credit card regularly to pay for personal and professional expenses, Ricklefs testified at the hearing that he no longer needed to use checks from the client trust account for those transactions.

**C. Client Security Commission Form.** During the time Brinkmeyer was attempting to complete the audit discussed above, Ricklefs completed and signed his 2012 "Combined Statement and Questionnaire" for the Client Security Commission. Despite his lack of recordkeeping and his admitted commingling of personal and client funds, in the questionnaire Ricklefs indicated that during the 2011 calendar year, he kept all client funds in a separate account, performed monthly reconciliations of his account with bank statements and client ledgers, and preserved client fund records for six years.

## II. Procedural History.

The Board filed its complaint against Ricklefs on April 24, 2013. The complaint began by referring generally to "deficiencies" in the 2008 audit and to Ricklefs's failure to correct those deficiencies. In more detail, the complaint alleged problems with the 2012 audit and with Ricklefs's responses to the 2012 Client Security Commission questionnaire. The complaint concluded by alleging Ricklefs had violated Iowa Rules of Professional Conduct 32:1.15 (safekeeping of property) and 32:8.4(c) (misconduct involving dishonesty, fraud, deceit, or misrepresentation) and Iowa Court Rules 45.1 (client trust account), 45.2 (action required upon receiving funds, accounting, and records), and 45.7(4) (advance fee and expense payments).

Ricklefs was served with requests for admissions, requests for production of documents, and interrogatories. He did not respond to them. On July 31, 2013, the Board filed a motion to compel responses to the document requests and the interrogatories. Ricklefs did not resist the motion, and the commission ordered him to serve responses no later than August 30 or else sanctions would be imposed. Ricklefs still did not respond. As a result, Ricklefs was precluded from offering any witnesses or evidence other than his own testimony. He was also barred from objecting to the Board's exhibits or from testifying other than in mitigation. In addition, several facts alleged in the complaint were held to be established for the purposes of the action.

During the hearing, Brinkmeyer was the Board's only witness. He reviewed the circumstances and findings of the 2012 audit. Brinkmeyer could not explain why it had taken four years from the unsatisfactory 2008 audit to perform a follow-up audit of Ricklefs. Nor could Brinkmeyer determine that any client had been harmed by Ricklefs's

trust account violations. As far as he could tell, trust account funds used for personal expenses had been earned before being removed from the account. Brinkmeyer also uncovered instances where Ricklefs had deposited personal funds into the trust account.

Ricklefs then testified on his own behalf. He admitted he had "knowingly violated the rules" by using his trust account for personal purposes. However, Ricklefs claimed he had subsequently put his trust account in order, removed all nonclient funds, and "been in compliance" since he began to use his mother's credit card for his personal and professional expenses.

Ricklefs admitted he still did not have a personal or business checking account. He restated his belief that if he opened an account, it would be executed upon because he had substantial unpaid bills, two of which had been reduced to judgment. He had not sought assistance of a debtor–creditor attorney to try to resolve his financial issues in order that he might obtain a personal or business account.

Despite the absence of harm to any of Ricklefs's clients, the Board pointed out that his failure to properly maintain the records for his client trust account and his commingling of personal funds with client funds had been ongoing, without improvement, since at least 2008. Ricklefs closed the hearing by again admitting he had commingled the funds, while stressing no client funds had ever been jeopardized. He did not contest the violations and agreed that "a period of suspension . . . is appropriate."

The commission issued its written findings of fact, conclusions of law, and recommended sanction on December 6, 2013. The commission's decision focused on the 2012 audit, referring to the prior

2008 audit as an aggravating circumstance.[1] In doing so, the commission seemed to follow the lead of the Board, which treated the 2008 audit as a prior incident rather than as a subject of the present disciplinary hearing.[2] The commission concluded Ricklefs had violated Iowa Rules of Professional Conduct 32:1.15 and 32:8.4(c) and Iowa Court Rule 45.1. The commission recommended that Ricklefs's license be suspended for a period of thirty days.

### III. Standard of Review.

We review attorney disciplinary proceedings de novo. Iowa Ct. R. 35.11(1); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Clarity*, 838 N.W.2d 648, 651 (Iowa 2013). The commission's findings and recommendations are given respectful consideration, but we are not bound by them. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Laing*, 832 N.W.2d 366, 367 (Iowa 2013).

The Board has the burden to prove the attorney's misconduct by a convincing preponderance of the evidence. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Murphy*, 800 N.W.2d 37, 42 (Iowa 2011). "Upon proof of misconduct, the court may impose a lesser or greater sanction than recommended by the commission." *Id.*

> If we find a violation of an ethical rule has occurred, our determination of the appropriate sanction is guided by the nature of the alleged violations, the need for deterrence, protection of the public, maintenance of the reputation of the bar as a whole, and [the attorney's] fitness to continue in the practice of law.

*Laing*, 832 N.W.2d at 367–68 (internal quotation marks omitted).

---

[1]The commission's decision stated, we believe incorrectly, that Ricklefs had been publicly reprimanded in connection with the 2008 audit.

[2]The only evidence the Board introduced regarding the 2008 audit was McGarvey's audit report.

**IV. Review of Alleged Ethical Violations.**

The commission found Ricklefs had committed all but two of the ethical violations alleged by the Board. We now consider the alleged violations.

**A. Trust Account Violations.** Iowa Rule of Professional Conduct 32:1.15(a) requires a lawyer to "hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property." Iowa R. Prof'l Conduct 32:1.15(a). Funds must be kept in a separate account and ["c]omplete records of such account funds . . . shall be kept by the lawyer and shall be preserved for a period of six years after termination of the representation." *Id.* The comments to the rule state "a lawyer should maintain on a current basis books and records in accordance with generally accepted accounting practice and comply with any recordkeeping rules established by law or court order." *Id.* r. 32:1.15(a) cmt. 1.

Rule 32:1.15 also incorporates chapter 45 of the Iowa Court Rules, which directs an attorney on how to properly maintain a client trust account. *See id.* r. 32:1.15(f); Iowa Ct. Rs. ch. 45. An attorney must keep a clearly designated trust account to hold funds received by the attorney from clients or third parties. Iowa Ct. R. 45.1. "No funds belonging to the lawyer or law firm may be deposited in this account," with the exception of "[f]unds reasonably sufficient to pay or avoid imposition of fees and charges that are a lawyer's or law firm's responsibility." *Id.* r. 45.1(1). Rule 45.2(3)(*a*) indicates financial records, including ledger records, bank statements, and check registers, must be maintained by an attorney for six years following the termination of representation of a client. *Id.* r. 45.2(3)(*a*). Rule 45.7(4) states an

attorney must notify a client in writing when withdrawing funds for expenses or fees from the trust account. *Id.* r. 45.7(4).

We have previously determined an attorney failed to hold his own property separate from that of his clients when he "used the trust account to deposit personal funds and to pay personal and business expenses." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Hall*, 728 N.W.2d 383, 387 (Iowa 2007); *accord Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Herrera*, 560 N.W.2d 592, 594 (Iowa 1997) ("Commingling of trust funds with the office or personal funds of the lawyer is strictly prohibited.").

In *Iowa Supreme Court Board of Professional Ethics & Conduct v. Sunleaf*, an attorney used his trust account for the deposit of earned fees and for the payment of both personal and business expenses to "hide funds from the federal internal revenue service which had levied on his business account for two unpaid payroll tax obligations." 588 N.W.2d 126, 126 (Iowa 1999). We found his conduct violated former Iowa Code of Professional Responsibilities for Lawyers DR 9–102(A), the predecessor to rule 32:1.15(a). *See id.* at 126–27. We did not consider the attorney's "pressing financial problems" a legitimate excuse. *Id.* at 127. As a treatise points out, the proscription on commingling is partly intended to protect the client's property from being levied on by the lawyer's own creditors. *See* 16 Gregory C. Sisk & Mark S. Cady, *Iowa Practice: Lawyer and Judicial Ethics* § 5:15(b), at 510 (2013). Had an alert creditor learned of Ricklefs's practice of keeping his personal funds in his client trust account, it might have attempted to levy on that account. Ricklefs violated rule 32:1.15(a) and rule 45.1.

Additionally, we recently found an attorney violated rule 45.2 when she failed to keep, with any regularity, a list of clients and the balance

each client had in her trust account and was unable to identify the sources of many of the deposits to her trust account. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Kersenbrock*, 821 N.W.2d 415, 419–20 (Iowa 2012). In that case, the auditor noted "entries in the manual ledger were sporadic and the trust account register was incomplete." *Id.* at 420; *see also Iowa Supreme Ct. Att'y Disciplinary Bd. v. Wengert*, 790 N.W.2d 94, 100 (Iowa 2010) (noting an attorney violated this rule when an auditor "found it was impossible to reconcile the [attorney's trust] account" as the attorney had commingled funds, kept inadequate records, and failed to complete reconciliations); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Hauser*, 782 N.W.2d 147, 152–53 (Iowa 2010) (finding a violation of this rule when an attorney claimed he regularly maintained client trust account ledgers, but was unable to produce any ledger for the client in question); *Comm. on Prof'l Ethics & Conduct v. Behnke*, 486 N.W.2d 275, 278 (Iowa 1992) ("Behnke's management of the money in his trust account and his failure to reconcile his trust account checkbook balances with bank statements are also violations of our ethical rules.").

Similar transgressions occurred here. There is no question that Ricklefs failed to maintain a check register or client ledgers, did not regularly perform reconciliations, and did not retain bank statements. Hence, he violated rule 45.2(3)(*a*).[3]

The Board also alleged that Ricklefs failed to notify clients when withdrawing funds from his trust account as required by rule 45.7(4). The commission did not find a violation of this rule. We agree with the commission here. Such activity may have occurred, but the subject was

---

[3]The commission found that Ricklefs had failed to maintain adequate trust account records but did not specifically determine that Ricklefs had violated rule 45.2 as alleged by the Board. We find a violation of this rule.

simply not explored at the disciplinary hearing. No references were made to specific clients or specific withdrawals that were alleged to have been made without notification. Therefore, on this record, we cannot find a violation of rule 45.7(4).

**B. Dishonesty.** "It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." Iowa R. Prof'l Conduct 32:8.4(c). "The Board must prove the attorney acted with some level of scienter greater than negligence." *Kersenbrock*, 821 N.W.2d at 421.

In *Kersenbrock*, we found a violation of this rule when an attorney falsely certified she had properly performed trust accounting procedures in her annual client security questionnaire. *Id.* Her verified response stated she kept client funds separate from her own and performed monthly reconciliations of her trust account with her client ledger balances and bank statements, but the record showed she could not have possibly reconciled the accounts because of the inadequacy of her records. *Id.; see also Clarity*, 838 N.W.2d at 656–57 (finding a violation of rule 32:8.4(c) when an attorney falsely certified on his annual questionnaire that all retainers had been deposited into a trust account); *Wengert*, 790 N.W.2d at 100 ("Wengert's false certification that her trust account was properly reconciled . . . violated rule 32:8.4(c) . . . ."); *Hall*, 728 N.W.2d at 387 (finding an attorney who commingled personal funds with trust account funds committed a further ethical violation when he "knowingly misrepresented the nature of at least one trust account transaction to the Client Security Commission auditor").

Here, Ricklefs submitted a client security questionnaire in 2012 certifying that, for the preceding calendar year, he had kept all client funds in a separate account from his personal funds, performed monthly

reconciliations of his trust account with bank statements and client ledgers, and preserved client fund records for six years. Additionally, on February 9, 2012, Ricklefs told the Client Security Commission's auditor that nonclient funds were not kept in his trust account and that he reconciled the bank statement to the check register each month.

These statements were intended to mislead the Client Security Commission. Ricklefs later admitted he did not keep a check register for his trust account and further admitted he regularly kept personal funds in that account. It is equally apparent that Ricklefs did not keep client ledgers, retain copies of bank statements, or perform monthly reconciliations. We find his knowingly false statements on the questionnaire and to the auditor violated rule 32:8.4(c).

### V. Consideration of Appropriate Sanction.

Having found the foregoing rule violations, we now consider the appropriate sanction. While there is no template of sanctions for attorney misconduct, "we try to achieve consistency with our prior cases when determining the proper sanction." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Templeton*, 784 N.W.2d 761, 769 (Iowa 2010). When deciding the appropriate sanction, we consider "the nature of the violations, protection of the public, deterrence of similar misconduct by others, the lawyer's fitness to practice, and [the court's] duty to uphold the integrity of the profession in the eyes of the public." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Axt*, 791 N.W.2d 98, 102 (Iowa 2010) (internal quotation marks omitted). We also take into account any "aggravating and mitigating circumstances present in the disciplinary action." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Parrish*, 801 N.W.2d 580, 588 (Iowa 2011). "Although we respectfully consider the discipline recommended by the Commission, the final decision on the appropriate sanction is for

this court." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Wright*, 840 N.W.2d 295, 300 (Iowa 2013) (internal quotation marks omitted).

As we have said recently regarding trust account violations,

> This case primarily involves trust account violations. "Sanctions for trust account and accounting violations span from suspensions of several months where the violations were compounded by severe neglect, misrepresentation, or failure to cooperate, to a public reprimand when the attorney, in an isolated instance, failed to deposit funds into his trust account because he believed the fees to be earned."

*Iowa Supreme Ct. Att'y Disciplinary Bd. v. Boles*, 808 N.W.2d 431, 442 (Iowa 2012) (citations omitted) (compiling cases). In the cases warranting more serious discipline, additional violations or other aggravating circumstances were present. *Id.*

In this case, Ricklefs improperly handled his trust account, commingled client funds with his own, failed to maintain proper records, and also knowingly misrepresented that he was engaged in appropriate trust account practices. His disregard for the rules governing trust accounts predated the 2008 audit and, despite being instructed to comply with the rules after the initial audit, continued through the period of the 2012 audit without improvement. Ricklefs himself conceded at the commission hearing that a period of suspension was appropriate.

We also deem Ricklefs's efforts to stall the 2012 audit and his failure to cooperate with the auditor and the Board aggravating factors. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Cunningham*, 812 N.W.2d 541, 551 (Iowa 2012) (noting the failure to cooperate with the Board's investigation is an aggravating factor).

An additional aggravating factor is Ricklefs's past disciplinary history. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. McCuskey*, 814

N.W.2d 250, 258 (Iowa 2012) ("Prior discipline is [an] aggravating factor we consider in determining the appropriate sanction."). Ricklefs previously received two public reprimands: one in 1998 for failing to provide a response to a Board inquiry after requesting two extensions, and one in 2007 for neglect and lack of diligence during the representation of a client. In addition, although Ricklefs was not sanctioned as a result of the 2008 audit, we agree with the commission that it is certainly an aggravating factor. *See Boles*, 808 N.W.2d at 442 ("A pattern of misconduct is an aggravating factor."); *see also Iowa Supreme Ct. Att'y Disciplinary Bd. v. Khowassah*, 837 N.W.2d 649, 658 (Iowa 2013) (noting that while private admonishments are not discipline per se, they can be an aggravating factor because "they put attorneys on notice not to repeat the conduct"). Ricklefs knew what he needed to do after the 2008 audit but failed to do it.

We also consider the mitigating factors in this case. As noted above, there are no indications any clients suffered harm. *See Kersenbrock*, 821 N.W.2d at 422 (finding lack of client harm to be a mitigating circumstance); *Boles*, 808 N.W.2d at 442 (indicating lack of harm to clients is a mitigating factor). Additionally, Ricklefs took responsibility for his actions before the commission and admitted his violations. *See Kersenbrock*, 821 N.W.2d at 422 (noting the taking of responsibility for actions is a mitigating factor).

In determining the appropriate sanction in this case, we draw guidance from the following attorney discipline cases involving trust account violations.

In *Kersenbrock*, we encountered a similar pattern of pervasive trust account violations. The attorney failed to deposit clients' retainers into a trust account, did not keep adequate trust account records, prematurely

withdrew fees in a probate case, and misrepresented her trust fund practices on her annual client security questionnaire. *Kersenbrock*, 821 N.W.2d at 419–21. There were mitigating circumstances: no clients were harmed, Kersenbrock had no disciplinary history, and she had acknowledged the inadequacies in her accounting practices and taken steps to correct the problems. *Id.* at 422. We suspended her law license for thirty days. *Id.*

In *Sunleaf*, we were confronted with an attorney who, like Ricklefs, used his trust account as a conduit for personal funds in order to avoid creditor claims against his personal assets. 588 N.W.2d at 126. Sunleaf, like Ricklefs, also falsified his client security questionnaire response. *Id.* at 127. There was no evidence of misappropriation of client funds, and the misconduct was "an aberration, wholly out of plumb with Sunleaf's many years of practice which appear to have been honorable." *Id.* We approved a public reprimand while indicating the case was a close call between a reprimand and a suspension. *Id.* at 126–27.

In *Boles*, we found an attorney's "flagrant, multiyear disregard for the billing and accounting requirements of our profession" warranted a thirty-day suspension of his license to practice. 808 N.W.2d at 441, 443. In that case, the attorney "withdrew unearned fees, delayed responding to client requests for accurate billings, and failed to promptly refund unearned fees." *Id.* at 441. The situation was compounded by neglect of a client matter. *Id.* However, we also considered as an important mitigating factor the evidence that the attorney had "corrected his practices to avoid reoccurrence," and noted the attorney had no trust account problems in the approximately four years leading up to his hearing. *Id.* at 442. Further mitigating factors included Boles's full cooperation with the Board's investigation, his extensive pro bono

practice, and the fact that no clients were harmed "apart from the delayed refunds." *Id.*

*Hall* involved an attorney who repeatedly mismanaged his trust account, using it to deposit and withdraw personal funds, while not maintaining a proper ledger of deposits and withdrawals. 728 N.W.2d at 385. At times, the attorney "used the trust account more for his personal dealings than for client matters." *Id.* He also repeatedly failed to respond to Board inquiries in response to various complaints, forged client signatures, made various misrepresentations, and neglected cases. *Id.* at 385–86. There was no evidence of misappropriation of client funds. *Id.* at 386. Nonetheless, we suspended the attorney's license indefinitely with no possibility of reinstatement for twelve months. *Id.* at 389.

In *Clarity*, an attorney failed to deposit advance fees into his trust account, failed to provide an accounting to his clients (even after the clients requested one), made misrepresentations in his certified responses to his Client Security Commission questionnaire, neglected client matters resulting in the arrests and incarceration of several clients, and charged an unreasonable fee. 838 N.W.2d at 655–60. In addition, he had three recent private admonishments. *Id.* at 662. We suspended his license for one year with no possibility of reinstatement. *Id.* at 663.

*Iowa Supreme Court Attorney Disciplinary Board v. Powell* involved an attorney who "basically ignored the rules and procedures for maintaining a trust account over a prolonged period of time." 830 N.W.2d 355, 357 (Iowa 2013). Client funds were deposited into the attorney's operating account, the attorney frequently paid funds to himself when he needed money before the fees were actually earned, and

the attorney failed to adequately manage the bookkeeping practices of the firm. *Id.* Because of a $43,000 trust account shortage, we had to temporarily suspend the attorney and appoint a trustee to take control of the attorney's trust account. *Id.* at 356. Although no client funds were ultimately lost, there were "years of utter disregard by Powell for the trust fund rules and practices." *Id.* at 359. Powell also had a prior disciplinary record. *Id.* at 356. We did take into account the attorney's prior seven-month interim suspension and ultimately imposed an indefinite suspension with no possibility of reinstatement for three months. *Id.* at 359–60.

In *Parrish*, a sixty-day suspension was considered the appropriate sanction for an attorney who "withdrew funds from his trust account before they were earned, failed to promptly notify his clients of the withdrawals, did not earn the amounts withdrawn, and did not return the remainder of funds upon request." *Parrish*, 801 N.W.2d at 583. Parrish's disciplinary history included six private admonitions, all of which related to a "failure to provide an itemization of services provided," and at least two of which involved withdrawal of funds in excess of the fees earned. *Id.* at 589. We concluded the attorney's conduct over a period of ten years had "developed into a pattern of violating the Iowa Rules of Professional Conduct and the rules of this court relating to the administration of trust accounts." *Id.* The refusal or inability to return client funds was considered an aggravating factor, while the attorney's taking responsibility for his actions, taking steps to correct the accounting issues, community involvement, and pro bono work were considered mitigating factors. *Id.*

We believe this case warrants a stiffer sanction than we imposed in *Kersenbrock, Sunleaf,* or *Boles.* Unlike those attorneys, Ricklefs was

given a second chance after the 2008 audit but did not mend his ways. And some of the mitigating circumstances present in those cases are absent here. Ricklefs tried to delay and deflect the investigation of his trust account practices virtually up until the December 2013 disciplinary hearing.

At the same time, the sum total of violations in this case is not comparable to what happened in *Hall* or *Clarity*. There is no indication that the quality of Ricklefs's legal work for his clients was ever compromised. Unlike those two cases, this case involves purely trust account violations and related misrepresentations.

*Parrish* and *Powell* are closer parallels to this case. Ricklefs's refusal to correct his trust account practices for years after he was informed of his deficient recordkeeping is similar to what transpired in *Parrish*, where the attorney did not modify his inadequate trust account and billing practices despite several private admonitions, and *Powell*, where the attorney basically ignored proper trust account procedures for years. One could argue that *Parrish* and *Powell* are more egregious than the present case. There the attorneys repeatedly withdrew funds before they were earned—an arguably more serious matter than running personal funds through a trust account. On the other hand, the misrepresentations in this case could potentially justify a more severe sanction. Balancing these considerations, we think the sanction here ought to be in the range of sanctions imposed in *Parrish* and *Powell*.

In light of all the foregoing, and particularly Ricklefs's complete failure to address the problems noted in the 2008 audit, we believe his license should be indefinitely suspended with no possibility of reinstatement for three months.

## VI. Conclusion.

We suspend Ricklefs's license to practice law in this state with no possibility of reinstatement for three months from the date of the filing of this opinion. This suspension shall apply to all facets of the practice of law. *See* Iowa Ct. R. 35.13(3). Ricklefs must comply with the notification requirements of Iowa Court Rule 35.23. Upon application for reinstatement, Ricklefs shall have the burden to show that he has not practiced law during the period of suspension and that he meets the requirements of Iowa Court Rule 35.14. The costs of this proceeding are assessed against Ricklefs pursuant to rule 35.27(1).

**LICENSE SUSPENDED.**