# IN THE SUPREME COURT OF IOWA

No. 13–1510

Filed March 14, 2014

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

Complainant,

vs.

**AARON J. THOMAS,**

Respondent.

On review of the report of the Grievance Commission of the Supreme Court of Iowa.

Review of a report filed by the Grievance Commission of the Supreme Court of Iowa recommending the suspension of an attorney's license. **LICENSE REVOKED.**

Charles L. Harrington and Wendell J. Harms, Des Moines, for complainant.

Aaron J. Thomas, Anamosa, pro se.

**WIGGINS, Justice.**

The Iowa Supreme Court Attorney Disciplinary Board brought a complaint against Aaron J. Thomas, alleging Thomas committed the crime of theft by misappropriation and violated the Iowa Rules of Professional Conduct, an Iowa Court Rule, and Iowa Code section 602.10119 (2011). A division of the Grievance Commission of the Supreme Court of Iowa found Thomas committed the crime of theft by misappropriation and violated the Iowa Rules of Professional Conduct, the Iowa Court Rule, and the Iowa Code. The commission recommended a six-month suspension from the practice of law with conditions.

Thereafter, the Board filed a statement regarding Thomas's sanction and recommended we revoke Thomas's law license. On our de novo review, we find the Board established by a convincing preponderance of the evidence Thomas committed violations of our rules by converting funds for his own use without having a colorable claim to those funds. Accordingly, we revoke Thomas's license.

## I. Scope of Review.

We review attorney disciplinary proceedings de novo. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Stowe,* 830 N.W.2d 737, 739 (Iowa 2013). The Board must prove the attorney's ethical misconduct by a convincing preponderance of the evidence. *Id.* "A convincing preponderance of the evidence is more than a preponderance of the evidence, but less than proof beyond a reasonable doubt." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. McCarthy,* 814 N.W.2d 596, 601 (Iowa 2012). This places a burden on the Board that is higher than the burden in civil cases but lower than the burden in criminal matters. *Stowe,* 830 N.W.2d at 739. We respectfully consider the commission's recommendations; however, they are not binding upon us. *Id.*

## II. Findings of Fact.

On our de novo review, we make the following findings of fact. Thomas graduated from law school in 2001 and received his law license in 2002. He subsequently joined his father's law practice in Anamosa.

The complaint against Thomas stems from his handling of a legal matter for Emily Street. In February 2009, Street went to Thomas for legal representation for a 2008 car accident. Street received a neck injury in the accident. She and her parents wanted to have the other party involved in the car accident pay for Street's medical bills and her car repair bill. Further, Street and her parents wanted the other party to pay back their insurance carrier, State Farm, for sums it paid because of the accident.

Thomas agreed to represent Street and her parents in the matter. They entered into a contingent fee agreement. The contingent fee agreement provided Thomas would receive thirty percent of the recovery if the parties settled after filing suit but before commencement of trial.

Thomas was successful in this matter. He filed a petition on December 2, 2009, and on April 25, 2011, Street and her parents settled the suit for $23,000. The other party's insurance carrier issued the check for $23,000 payable to the Thomas Law Firm; Street; Street's parents; Street's health insurance provider, Healthcare Recoveries; and State Farm. Thomas had a limited power of attorney to endorse the check on behalf of State Farm. To this point, Street and her parents were satisfied with Thomas's representation.

Thomas's subsequent distribution of the $23,000 is the crux of this grievance proceeding. Street and her parents understood the contingent fee agreement gave Thomas thirty percent of Street's portion

of the settlement, or $5400.[1] They understood the agreement also required Thomas to pay any unpaid medical expenses on Street's behalf. Further, they understood the agreement to require Thomas to reimburse Street's health insurance provider and State Farm for sums these companies advanced on Street's account due to the accident. Additionally, Thomas claims Street and her parents agreed for him to keep $500 in his trust account for expenses Thomas might have in pursuing Street's underinsured motorist claim against State Farm. As of April 2011, Street and her parents were entitled to the proceeds of the settlement less the amount he agreed to pay to the third parties, his attorney fees, and the $500 in expenses.

In regards to his obligation to pay any unpaid medical expenses and reimburse the insurance companies, Thomas wrote one check to Healthcare Recoveries for $2824.44 on April 26, 2011, to reimburse Street's health care provider for the sums it advanced. This should have left the $5000 for State Farm, $500 for expenses, and the remaining $9275.56 in his trust account for Street and any unpaid medical bills.

At this point, Thomas's actions became questionable in numerous ways. First, Thomas withheld the full $9275.56 for months, even though the Streets asked Thomas to disburse the funds. Thomas claims he entered into an agreement with Street and her parents to withhold this money to pursue a separate action against Street's insurance carrier, State Farm. Street agreed she wanted to sue State Farm. However, Street did not recall discussing a fee agreement for the State Farm lawsuit, she did not agree that Thomas could retain this money to cover

---

[1]Thomas divided the $23,000 into two amounts: $5000 to reimburse State Farm and $18,000 for Street. He calculated his attorney fee from each individual amount. Therefore, his thirty percent fee from Street's portion was thirty percent of $18,000 or $5400.

State Farm expenses, and she did not enter into a fee agreement with Thomas to that effect. Thomas acknowledged he would not normally ask for an advance of more than $500 to cover the expenses of a lawsuit. Thomas's trust account records indicated Thomas did not pay any costs for the State Farm lawsuit out of this money. We find Street to be more credible. We also find the only amount Thomas would have a colorable claim to would be the $500 for expenses.

Second, Thomas wrote a series of checks from Street's settlement proceeds in his trust account for personal and business purposes that exceeded his fees. Thomas wrote two checks to himself totaling $9500. Thomas wrote a check to an employee for $1000. Thomas also wrote a check to his then wife for $1000. While Thomas originally justified this payment as a business expense because his then wife reviewed and organized Street's medical reports, he later admitted he gave her the money as a way to share in the settlement. He drew all four checks on the client trust account and acknowledged they were payments from Street's settlement. These checks totaled $11,500. This amount exceeded his agreed upon fee by $6100.

Third, Thomas did not pay the $5000 to State Farm. Thomas believed his fee for acting on State Farm's behalf was thirty percent, or $1500. Thomas issued a check to State Farm for $3350, withholding a fee of $1650. Although he dated the check April 26, 2011, State Farm did not receive the check until February 2012. State Farm was unable to cash the check due to the date on the check and requested a replacement check. Thomas has never responded to State Farm's request.

Finally, Thomas reimbursed Healthcare Recoveries, but did not pay Street's remaining medical expenses. Street did have an unreimbursed

medical bill from Physiotherapy Associates. Thomas was supposed to pay this bill from the $9275.56 retained in his trust account. There is no evidence Thomas used the remaining $9275.56 to pay Street's medical bills. Street forwarded these bills to Thomas, but continued to receive collection notices from Physiotherapy Associates until April 2012.

In summary, Street did not receive her portion of the settlement until nine months after Thomas received the settlement check. During the nine months, Thomas's trust account balance dropped below what he owed to Street. Thomas also admitted he withdrew money from the client trust account to pay for Dish Network at his office and for his home mortgage. The lowest balance for the client trust account was in June 2011 at $236.55.

In January 2012, Street received a check from the client trust account for $10,304.24. This check overdrew Thomas's client trust account. Thomas wrote a check to the client trust account from his personal account to correct the overdraft. Neither Street nor her parents received a written summary showing the settlement distribution.

Thomas closed his client trust account in October 2012 and did not open a new client trust account. Thomas admitted he still had possession of $3350 that either belonged to State Farm or to Street.

On May 6, 2013, Thomas represented himself before a division of the grievance commission. Thomas admitted that at the time he handled Street's funds he was unfamiliar with client trust account rules. He also admitted he wrote checks for his own benefit that exceeded his colorable claim to funds from Street's settlement.

Based on our de novo review, we can only come to one conclusion—Thomas used money belonging to a client and State Farm for his own use without having a colorable claim to those funds.

**III. Disciplinary Proceedings.**

On January 11, 2012, Street filed a complaint with the Iowa Supreme Court Attorney Disciplinary Board. Thomas signed for certified mail corresponding to the complaint and letter from the Board. The Board sent Thomas letters on October 29, October 31, November 15, and December 5. Thomas received all of these letters but did not respond.

The commission filed its report and found Thomas committed the crime of misappropriation, which violated Iowa Rules of Professional Conduct 32:1.15(a), (d), 32:8.4(b)–(c), Iowa Court Rule 45.2(2), and Iowa Code section 602.10119. Further, the commission found Thomas failed to communicate with his client as required by rule 32:1.4(a)(3)–(4), and failed to act with reasonable diligence and promptness as required by rule 32:1.3.[2] Finally, the commission determined Thomas violated rule 32:8.1(b) by failing to respond to the Board's requests for documentation.

The commission recommended Thomas receive a six-month suspension, be required to complete a basic skills course that includes the topic of client trust accounts, and be required to associate with a nonrelated mentor with experience in trust accounts and ethics when Thomas opens a client trust account after reinstatement.

As required by rule 35.11(1), we review the commission's report de novo. Iowa Ct. R. 35.11(1). On November 22, 2013, the Board filed a statement requesting we revoke Thomas's law license. *See* Iowa Ct. R. 35.11(1) (allowing the parties to a grievance proceeding to file statements in support of or in opposition to the discipline recommended by the commission). The Board emphasized Thomas's misappropriation of

---

[2]Although the Board charged Thomas with violating rule 32:1.5(c), the commission's findings do not find a violation of this rule other than to mention Thomas did not send an accounting to his clients.

funds, stating Thomas did not have a colorable claim to the money in the client trust account that belonged to Street and State Farm.

### IV. Ethical Violations.

The record shows numerous examples of Thomas's unethical conduct, including failing to respond to clients, trust account violations, and failing to put a contingent fee agreement in writing. However, there is sufficient evidence in the record to prove Thomas converted client funds for his own use. Therefore, it is unnecessary for us to address any other rule violations. *See Stowe*, 830 N.W.2d at 741.

The Board charged Thomas with violating rules 32:8.4(b) and (c). These rules provide:

> It is professional misconduct for a lawyer to:
>
> . . . .
>
> (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects;
>
> (c) engage in conduct involving dishonesty, fraud, deceit, or misrepresentation[.]

Iowa R. Prof'l Conduct 32:8.4(b)–(c). The criminal act of theft by misappropriation states a person commits theft when the person:

> Misappropriates property which the person has in trust, or property of another which the person has in the person's possession or control, whether such possession or control is lawful or unlawful, by using or disposing of it in a manner which is inconsistent with or a denial of the trust or of the owner's rights in such property, or conceals found property, or appropriates such property to the person's own use, when the owner of such property is known to the person.

Iowa Code § 714.1. Even though the state never formally charged Thomas with a crime, a criminal conviction is not a prerequisite to finding a violation under our rules. *See Comm. on Prof'l Ethics & Conduct v. Hall*, 463 N.W.2d 30, 35 (Iowa 1990) ("It is . . . immaterial that

respondent was not charged or convicted of a crime. A criminal conviction is not a condition precedent to a discipline proceeding when the facts themselves warrant discipline.").

The Board also charged Thomas with violating Iowa Court Rule 45.2(2) and Iowa Code section 602.10119. Rule 45.2(2) states:

> *Accounting and returning funds or property.* Except as stated in this chapter or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and shall promptly render a full accounting regarding such property.

Iowa Ct. R. 45.2(2). The Code provides:

> An attorney who receives the money or property of a client in the course of the attorney's professional business, and refuses to pay or deliver it in a reasonable time, after demand, is guilty of a theft and punished accordingly.

Iowa Code § 602.10119.

Thomas admitted and the evidence supports that he had no colorable claim to the money he used from the trust account for his own personal use. Therefore, we find Thomas violated these rules and statute through his misappropriation of funds from Street and State Farm for his own use without having a colorable claim to those funds.

## V. Sanction.

The sanction we impose on an attorney for a trust account violation depends on the facts of the violation. If an attorney has a colorable future claim to the money converted, we will not revoke the attorney's license. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. McCann,* 712 N.W.2d 89, 97 (Iowa 2006) (finding the attorney had a colorable future claim to the funds he converted so suspension, not revocation, was appropriate). In cases where the attorney takes a

retainer in anticipation of doing the work and withdraws money from the trust account before the attorney earns it, we assume the attorney has a colorable future right to those funds unless the Board proves otherwise. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Powell*, 830 N.W.2d 355, 358–59 (Iowa 2013) ("[T]he evidence failed to support a finding that Powell had no colorable claim to the funds he removed from his trust account or failed to place in his trust account."); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Boles*, 808 N.W.2d 431, 441–42 (Iowa 2012) (finding a flagrant violation of our trust account rules, but suspension was appropriate when the violation could be characterized as the attorney paying himself fees before he earned them); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Parrish*, 801 N.W.2d 580, 586, 590 (Iowa 2011) (finding an attorney withdrew funds from the trust accounts before the fees were actually earned and suspension was appropriate).

On the other hand, "[t]here is no place in our profession for attorneys who convert funds entrusted to them. It is almost axiomatic that we revoke licenses of lawyers who do so." *Comm. on Prof'l Ethics & Conduct v. Ottesen*, 525 N.W.2d 865, 866 (Iowa 1994). The amount of money an attorney converts does not lessen the sanction. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Anderson*, 687 N.W.2d 587, 590 (Iowa 2004).

Here, Thomas had a contingent fee arrangement with Street and her parents. Upon the payment of the settlement to Thomas's office by the tortfeasor's insurance company, Thomas was only entitled to an amount equal to his contingent fee and expenses. He could not have earned any other fees or been reimbursed any other expenses from the Street settlement he deposited in his trust account. Thus, when he withdrew additional funds from the trust account in excess of his fee and

expenses and the evidence establishes he spent the additional withdrawals on personal expenses, the Board proved by clear and convincing evidence Thomas did not have a colorable future claim to any sums in the trust account from the settlement beyond his fees and expenses. It is for this reason, we find he converted Street's and her parents' funds in his trust account for his own personal use.

In cases where an attorney is to be paid a contingent fee from a personal injury settlement, and he or she converts any funds due the client, we have consistently revoked the attorney's license. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Adams*, 809 N.W.2d 543, 544–46 (Iowa 2012) (revoking the license of an attorney who converted client settlement funds to the attorney's personal use); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Reilly*, 708 N.W.2d 82, 85 (Iowa 2006) (same); *Ottesen*, 525 N.W.2d at 866 (same). Although Thomas eventually paid Street the money he converted, restitution of client funds does not preclude us from revoking an attorney's license as a sanction. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Wengert*, 790 N.W.2d 94, 102 (Iowa 2010); *Reilly*, 708 N.W.2d at 84.

## VI. Disposition.

After fully considering the matter, we order the license of respondent, Aaron J. Thomas, to be revoked effective with the filing of this opinion. We assess costs to respondent as provided in Iowa Court Rule 35.27(1).

**LICENSE REVOKED.**