# IN THE SUPREME COURT OF IOWA

No. 13–0964

Filed April 25, 2014

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

Complainant,

vs.

**WILLIAM S. MORRIS,**

Respondent.

On review of the report of the Grievance Commission of the Supreme Court of Iowa.

Review of a report filed by the Grievance Commission of the Supreme Court of Iowa recommending the suspension of an attorney's license. **LICENSE SUSPENDED.**

Charles L. Harrington and Elizabeth E. Quinlan, Des Moines, for complainant.

William S. Morris, Des Moines, pro se.

**HECHT, Justice.**

The Iowa Supreme Court Attorney Disciplinary Board charged William Morris with violations of the Iowa Rules of Professional Conduct after a series of audits revealed trust account irregularities. After a hearing, a division of the Grievance Commission of the Supreme Court of Iowa found Morris's actions violated several ethical rules and recommended a suspension of his license to practice law. Morris has appealed from the commission's recommendation. After reviewing the record, we find Morris committed ethical violations warranting a suspension.

## I. Factual and Procedural Background.

Morris was first licensed to practice law in 1983. He engaged in private practice in Des Moines with his older brother who—like their father—was also an attorney. Morris's early career path took an unfortunate detour in 1988 when his license to practice was suspended for three months for failing to file his state income tax returns for 1983 and 1984 and falsely representing in his 1985 and 1986 attorney questionnaires that those returns were filed. *See Comm. on Prof'l Ethics & Conduct v. Morris* (*Morris I*), 427 N.W.2d 458, 460 (Iowa 1988). Morris's license to practice was again suspended in 1992 when this court found he violated several disciplinary rules in representing a client facing deportation. *Comm. on Prof'l Ethics & Conduct v. Morris*, 490 N.W.2d 806, 808–10 (Iowa 1992) (imposing suspension of six months for neglect, handling matter beyond his competence, conduct involving dishonesty, and violation of certain advertising rules).

Morris came to the attention of the Client Security Commission upon its receipt of several overdraft notices from the bank where Morris kept his client trust account. The trust account experienced one

overdraft per year in 2005 through 2008. Two more overdrafts were noted in late 2009, and yet another occurred in April 2010. When auditors representing the Client Security Commission arrived at Morris's office in early May 2010 to review the status of the account, they discovered obvious bookkeeping and management deficiencies impeding an efficient and comprehensive audit.

Morris told the auditors he had no employees and revealed he personally performed all banking functions for the trust account. The auditors discovered Morris kept no general ledger for the account and no separate ledger evidencing for each client the source of all funds deposited, the names of all persons for whom the funds were held, or the record of charges and withdrawals pertaining to each client. Morris produced for the auditors some trust account bank statements in their original envelopes,[1] a loose-leaf checkbook with a check stub register for the account covering the period from January 2009 through May 3, 2010, a handwritten list of clients, and two pages of "trust account sheets" generated by Morris for the auditors.

Morris, who was cordial and helpful in his interactions with the auditors, produced no documentary evidence for the auditors tending to show he kept running trust balances for individual clients or that he regularly reconciled the trust account. The bank records he made available to the auditors evidenced numerous deposits and disbursements that could not be attributed to specific clients and documented several account overdrafts for the years 2008 and 2009.

---

[1]Morris failed to produce bank statements for the auditors for the months of August and December 2009. The absence of the December statement was attributed by Morris to the recent relocation of his office and resulting postal forwarding issues.

The auditors also found a shortage of $11,617.68 in examining the trust account. Part of this shortage was the result of activity related to a personal injury settlement Morris achieved for his clients, members of the Schwaller family. Morris told the auditors he had disbursed net settlement proceeds to the clients, and had written a check to himself for his attorney fee. A portion of the settlement proceeds was retained briefly in the trust account for the purpose of satisfying a medical subrogation claim, but dissipated before the claim was paid.[2] The auditors attributed the remainder of the trust account shortage to negative balances for several clients, and to the missing sum of $5686.96 that had been deposited in the account for the benefit of Morris's mother's trust.[3] When the auditors performed the audit in May 2010, the total balance in the account was only $85.83, well short of the amount owed the Schwallers' subrogee, the amounts required to satisfy the claims of Morris's other clients, and the funds necessary to cover the deposit for the benefit of Morris's mother's trust.

Evidence reviewed by the auditors during the audit disclosed Morris had provided false answers on his "Iowa Supreme Court Client Security 2010 Combined Statement." In particular, Morris had

---

[2]Morris promptly distributed net settlement proceeds to the Schwallers and withdrew his attorney fee from the trust account, leaving $5278.74 in the account for the purpose of satisfying a subrogation claim. The auditors discovered, however, that the balance of funds in the trust account was, within a month after the settlement, insufficient to cover the unsatisfied subrogation obligation. As a consequence of the woefully incomplete records maintained by Morris, the auditors were unable to determine what happened to the funds intended for the Schwallers' subrogee. On more than one occasion, Morris wrote checks on the trust account to dissatisfied clients refunding advance fee payments after he had withdrawn fees from the account for himself. With no record of a running trust account balance for individual clients, this practice likely contributed to the creation of negative trust account balances for several clients identified by the auditors.

[3]The record offers no explanation for the deposit of funds belonging to Morris's mother's trust in Morris's client trust account.

untruthfully represented in his online answers that he had performed monthly reconciliations of the trust account and that he had experienced no trust account overdrafts during 2009. Before leaving Morris's office, the auditors provided him with written guidelines detailing for Iowa lawyers the proper management of client trust accounts.

On June 4, 2010, the assistant director for boards and commissions with the Office of Professional Regulation sent a letter to Morris summarizing the deficiencies noted by the auditors in their May 2010 review of Morris's trust account records. The letter directed Morris to deposit $11,617.68 in the account to alleviate the shortage no later than June 18. The June 4 letter also requested Morris provide the Client Security Commission with the April 2010 bank statement for the trust account, an amended account ledger documenting the dates of deposits and withdrawals, photocopies of checks written on the account, and a copy of Morris's file for the Schwaller matter. The letter further informed Morris the auditors would contact him within thirty to forty-five days for the purpose of arranging another visit by the auditors with the expectation that the record-keeping deficiencies and account arrearage would by then be remediated.

The auditors returned to Morris's office on August 24. During this visit, they requested documentation of fee billings to certain clients accounting for withdrawals from the trust account. Morris told the auditors he had been in practice for twenty-five years, but had never heard of a requirement that lawyers must provide clients a contemporaneous accounting when making trust account withdrawals for payment of the lawyer's attorney fees and expenses. Morris informed the auditors he did not typically provide clients a contemporaneous

accounting when making such withdrawals, because he instead generally prepared a bill for clients only if they requested one.

During the August 24 visit, the auditors also inquired about the fee paid to Morris for services rendered to the Reeves estate. The decedent Reeves had died on March 25. Morris was engaged to perform legal services for the estate. He received and deposited the sum of $3200 in his client trust account on April 20, as an advance payment of the fee he expected to earn for his services. Morris then withdrew $2200 from the trust account by writing a check payable to himself the very next day. He wrote two more checks to himself totaling $1000, fully depleting the trust account balance for the Reeves estate by April 26. When the auditors asked Morris to produce court orders approving payment of his legal fee charged to and collected from the Reeves estate, Morris told the auditors no court approval of the fee was required because the estate was "private engagement work." Morris was also unable to produce a written accounting to the client detailing any services performed for the fee charged to the Reeves estate. He admitted to the auditors the estate had not yet been closed on August 24.

Although the auditors confirmed during the August 2010 visit that funds had been deposited in the trust account to cover the shortage identified during the May 2010 audit, Morris was unable to demonstrate he had become compliant with the requirement of regular account reconciliation. The auditors' requests for production of deposit slips pertaining to the trust account again went unheeded. Consistent with their findings from the May audit, the auditors noted in August 2010 that Morris's trust account records still lacked documentation evidencing a continuous running balance for each client.

An auditor made another follow-up visit to Morris's office on December 13, 2011. After reviewing records produced by Morris, the auditor reported "more of the same" trust account management and maintenance deficiencies discovered in May and August of 2010:

> Besides permitting individual client balances to become negative, there are inadequacies in bookkeeping, including not maintaining individual client ledger or sub-account records; not maintaining a computed balance or check register balance; not performing monthly bank account reconciliations including the required lists of individual client balances monthly which should tie out to reconciled checkbook balance. Also no copies of deposit tickets are maintained and numerous bank transactions are in currency. No accountings to clients are available for our review, and are apparently not prepared.

The Board filed a complaint against Morris alleging he violated Iowa Rules of Professional Conduct 32:1.5(a) (lawyer shall not charge or collect an unreasonable fee or violate any restrictions imposed by law), 32:1.5(c) (contingent fee agreement shall be in writing signed by client and set forth method by which fee is to be determined), 32:1.15(c) (lawyer shall deposit fees and expenses paid in advance into a client trust account, to be withdrawn by lawyer only as fees are earned or expenses incurred), 32:1.15(f) (client trust accounts must be maintained in compliance with the requirements of chapter 45 of Iowa Court Rules), and 32:8.4(c) (engaging in dishonesty, fraud, deceit, or misrepresentation).

Following a hearing, the grievance commission made no finding whether Morris violated rule 32:1.5(a) when he collected a fee from the Reeves estate in violation of restrictions imposed by Iowa law, or whether he violated rule 32:1.5(c) by failing to memorialize the terms of engagement in the Schwallers' contingent fee case. Although the commission also made no specific finding that Morris violated rule

32:1.15(c) by withdrawing fees from the trust account only after they had been earned, the commission did find Morris violated Iowa Court Rule 45.7(3), the corollary court rule. The commission also found Morris had violated rule 32:1.15(f) in failing to keep records required by Iowa Court Rule 45.2(3), in withdrawing fee and expense payments from the trust account before the fee was earned or the expense was incurred, in violation of Iowa Court Rule 45.7(3), and in withdrawing fees or expenses from the trust account without giving contemporaneous notice and a complete accounting to his clients. The commission further found, however, that the Board failed to prove Morris had violated rule 32:8.4(c) by engaging in dishonesty, fraud, deceit, or misrepresentation. The commission rejected the Board's contention that Morris's mismanagement of the account manifested "willful blindness," finding instead his serious violations of the applicable rules were a result of sloppiness and oversight. The grievance commission recommended Morris's license to practice law be suspended for six months.

## II. Scope of Review.

We review attorney disciplinary proceedings de novo. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Stowe*, 830 N.W.2d 737, 739 (Iowa 2013). An attorney's ethical misconduct must be proved by a convincing preponderance of the evidence. *Id.* " 'A convincing preponderance of the evidence is more than a preponderance of the evidence, but less than proof beyond a reasonable doubt.' " *Id.* (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. McCarthy*, 814 N.W.2d 596, 601 (Iowa 2012)). This burden is greater than the burden in civil cases but less than the burden in criminal matters. *Id.* We respectfully consider the commission's recommendations, but they are not binding upon us. *Id.*

**III. Violations**.

**A. Rule 32:1.5(a)**. This rule provides in relevant part: "A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses, or violate any restrictions imposed by law." Iowa R. Prof'l Conduct 32:1.5(a). Although we credit Morris's testimony that a court order was *eventually* entered approving his attorney fee in the Reeves estate, the evidence establishes the entire fee was withdrawn from the trust account long before the court order approving the fee was entered. The fee was collected by Morris in violation of clearly established temporal restrictions prescribed by a court rule. *See* Iowa Ct. R. 7.2(4) (detailing when attorney fees may be collected by attorneys handling probate matters). An attorney who takes the entire fee in violation of rule 7.2(4) commits a violation of rule 32:1.5(a). *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Kersenbrock*, 821 N.W.2d 415, 420 (Iowa 2012). The district court's order subsequently approving Morris's attorney fee did not excuse the impropriety of taking the fee in violation of the court rule. Accordingly, we find the Board proved Morris violated rule 32:1.5(a) by collecting his fee in the Reeves estate before it was authorized under the applicable rule.[4]

**B. Rule 32:1.5(c)**. Under this rule, contingent fee agreements with clients must be in writing and signed by the client. Iowa R. Prof'l Conduct 32:1.5(c). Upon conclusion of a contingent fee matter, the attorney must "provide the client with a written statement stating the

---

[4]Morris admitted during the hearing that he had similarly taken his attorney fee for services rendered to the Glanz estate before the fee was approved by the court. This estate, like the Reeves estate, remained open after Morris withdrew his entire fee from the trust account. As in the Reeves estate, Morris was unable to produce for the auditors a written accounting to the client detailing the services provided to the Glanz estate or the fees charged for them.

outcome of the matter and, if there is a recovery, showing the remittance to the client and the method of its determination." *Id.* As we have noted, the commission made no findings on this alleged violation. Although we have some doubt about whether Morris had a written contingent fee agreement with the Schwallers, or whether he provided them with a written statement upon the conclusion of the matter showing the remittance to the clients and the method of its determination, we find the Board failed to prove a violation of this rule by a convincing preponderance of the evidence.

**C. Rule 32:1.15(c)**. This rule requires lawyers to deposit into a client trust account legal fees and expenses that have been paid in advance, and allows withdrawal of these funds by lawyers only as the fees are earned or the expenses are incurred. *Id.* r. 32:1.15(c). The Board's posthearing brief makes no argument contending Morris violated this rule and we find the Board failed to prove a specific violation of it.

**D. Rule 32:1.15(f)**. The Iowa Rules of Professional Conduct establish comprehensive rules governing the management and maintenance of client trust accounts. *See* Iowa R. Prof'l Conduct 32:1.15. Rule 32:1.15(f) mandates that all client trust accounts "shall be governed by chapter 45 of the Iowa Court Rules." Iowa R. Prof'l Conduct 32:1.15(f).

Iowa Court Rule 45.2(3) mandates that lawyers practicing in this jurisdiction maintain and retain for a period of six years after termination of the representation the following records:

> (1) Receipt and disbursement journals containing a record of deposits to and withdrawals from client trust accounts, specifically identifying the date, source, and description of each item deposited, as well as the date, payee and purpose of each disbursement;

(2) Ledger records for all client trust accounts showing, for each separate trust client or beneficiary, the source of all funds deposited, the names of all persons for whom the funds are or were held, the amount of such funds, the descriptions and amounts of charges or withdrawals, and the names of all persons or entities to whom such funds were disbursed;

. . . .

(4) Copies of accountings to clients or third persons showing the disbursement of funds to them or on their behalf;

(5) Copies of bills for legal fees and expenses rendered to clients;

(6) Copies of records showing disbursements on behalf of clients;

(7) The physical or electronic equivalents of all checkbook registers, bank statement, records of deposit, prenumbered canceled checks, and substitute checks provided by a financial institution;

. . . .

(9) Copies of monthly trial balances and monthly reconciliations of the client trust accounts maintained by the lawyer; and

(10) Copies of those portions of client files that are reasonably related to client trust account transactions.

Iowa Ct. R. 45.2(3)(*a*). The record overwhelmingly documents Morris's failure to comply with these clearly prescribed record-keeping and account-management requirements. His noncompliance persisted even after the auditors supplied him with an informational roadmap in May 2010.

Iowa Court Rule 45.7(4) mandates that a lawyer accepting advance fee or expense payments must notify the client in writing of the time, amount, and purpose of any withdrawal of the fee or expense. The notice and a complete accounting of the withdrawal must be transmitted to the client no later than the date of withdrawal. Iowa Ct. R. 45.7(4). Morris

acknowledged to the auditors his practice of ignoring this rule, admitting he only provided his clients with an accounting if he was requested to do so. Indeed, when confronted by the auditors with his noncompliance in May 2010, Morris claimed he had never heard of the rule in his more than twenty-five years of practice. We find ample evidence of Morris's violation of rule 45.7(4).

**E. Rule 32:8.4(c)**. It is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." Iowa R. Prof'l Conduct 32:8.4(c). To establish a violation of this rule, "the Board must prove the attorney acted with some level of scienter greater than negligence." *Kersenbrock*, 821 N.W.2d at 421. As we have noted, the commission found Morris committed no violation of this rule because his noncompliance with the rules prescribing maintenance of trust account records and management of clients' funds held in trust was a function of sloppiness and oversight.

We respectfully disagree and find the Board proved by a convincing preponderance of the evidence that Morris violated this rule. We find Morris engaged in knowing dishonesty when he falsely answered the "Iowa Supreme Court Client Security 2010 Combined Statement." In particular, he falsely represented that he regularly reconciled his client trust account—something he persistently failed to do even after auditors repeatedly reminded him he must. Morris was quite aware of the wrongfulness and potential adverse consequences of making false representations in answers to questions posed in annual professional questionnaires, having been previously disciplined for such conduct. *See Morris I*, 427 N.W.2d at 460.

**IV. Discipline**.

On review of the grievance commission's report, we are free to adopt, increase, or reduce the sanction recommended by the commission. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Eich*, 652 N.W.2d 216, 217 (Iowa 2002). "There is no standard sanction for a particular type of misconduct, and though prior cases can be instructive, we ultimately determine an appropriate sanction based on the particular circumstances of each case." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Earley*, 729 N.W.2d 437, 443 (Iowa 2007) (citing *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Plumb*, 589 N.W.2d 746, 748–49 (Iowa 1999)). When determining the appropriate sanction, we consider " 'the nature of the alleged violations, the need for deterrence, protection of the public, maintenance of the reputation of the [bar] as a whole, and the respondent's fitness to continue in the practice of law.' " *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Freeman*, 603 N.W.2d 600, 603 (Iowa 1999) (quoting *Comm. on Prof'l Ethics & Conduct v. Havercamp*, 442 N.W.2d 67, 69 (Iowa 1989) (per curiam)). The court also considers both aggravating and mitigating circumstances, if any, in setting the sanction. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Sherman*, 637 N.W.2d 183, 187 (Iowa 2001).

The range of discipline imposed for substantial failures to keep and maintain records of trust account transactions ranges from a public reprimand, *see Iowa Supreme Court Bd. of Prof'l Ethics & Conduct v. Herrera*, 560 N.W.2d 592, 595 (Iowa 1997), to a suspension of several months' duration, *see Iowa Supreme Ct. Att'y Disciplinary Bd. v. Ricklefs*, ___ N.W.2d ___, ___ (Iowa 2014) (imposing suspension of three months for persistent violation of rules forbidding commingling of personal and trust account funds and requiring record keeping and trust account

management, and dishonesty in reporting compliance); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Powell*, 830 N.W.2d 355, 360 (Iowa 2013) (imposing suspension of three months following temporary suspension of seven months' duration for wholesale mismanagement of attorney trust account); *Kersenbrock*, 821 N.W.2d at 421–22 (suspending license for thirty days for failure to deposit advance fee payments in a trust account, failing to keep required trust account records, taking a fee in a probate matter before it was authorized under court rules, and falsely certifying status of trust account procedures); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Boles*, 808 N.W.2d 431, 438–40, 443 (Iowa 2012) (imposing suspension of thirty days for pattern of billing and accounting deficiencies in five cases, withdrawing fees before they were earned in four cases, and neglect of one case); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Parrish*, 801 N.W.2d 580, 586–87, 590 (Iowa 2011) (suspending attorney's license for sixty days for failing to timely refund unearned fees to a client in several cases, withdrawing fees from a trust account in several cases before they were earned and without contemporaneous notice to clients).  We conclude Morris's violations of rules requiring trust account management are properly placed at the long end of this range because of several aggravating factors.

As in *Ricklefs* and *Powell*, Morris's record-keeping and management deficits were severe and they persisted over a long period of time even after the Client Security Commission intervened with an audit and provided information that should have facilitated compliance with the applicable rules.  Like the attorneys in *Ricklefs* and *Powell*, Morris is a seasoned attorney who has practiced more than twenty-five years.  We consider Morris's years of experience as an aggravating factor affecting our determination of the appropriate sanction.  *See Iowa Supreme Ct. Bd.*

*of Prof'l Ethics & Conduct v. Gallner*, 621 N.W.2d 183, 188 (Iowa 2001) (considering lawyer's long years of experience as a factor in choice of sanction).

An additional aggravating factor affecting our determination that the appropriate sanction in this case must be on the long end of the range of sanctions noted above is the fact that—unlike any of the other attorney–respondents in the cases cited above—Morris has been suspended on three prior occasions.[5] *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. McKittrick*, 683 N.W.2d 554, 563 (Iowa 2004) (noting history of prior discipline as an aggravating circumstance).

In determining the proper sanction in this case, we must also consider that as a consequence of Morris's violations of our rules mandating trust account record keeping, clients' funds and funds intended for the satisfaction of a subrogation interest were misappropriated. We have recently distinguished between attorneys' misappropriations of trust funds leading to revocation and trust account misappropriations resulting in a lesser sanction. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Thomas*, ___ N.W.2d ___, ___ (Iowa 2014). In *Thomas*, we noted we have not chosen revocation as a sanction when attorneys have withdrawn from their client trust account fees they had not yet earned, provided they intended to perform the work and therefore had a colorable interest in the funds. *Id.* at ____. We have imposed the sanction of revocation, however, when attorneys have misappropriated

---

[5]In addition to the two suspensions we have already noted, Morris was suspended in 2011 for failure to file his annual continuing legal education fee and report.

funds from their client trust accounts in excess of their anticipated fees and used the funds on personal expenses. *Id.* at _____.

We conclude Morris's misappropriations from his client trust account are more closely aligned with the cases in which we have imposed a less severe sanction than revocation. Our conclusion here is based in part on the Board's failure to prove Morris used trust funds to pay personal or business expenses. Unlike the respondent in *Thomas*, Morris did not admit he withdrew client funds from a trust account to pay a cable television bill or other personal or office expenses. We conclude, moreover, that Morris's misconduct is comparable to that of the respondent in *Powell* whose license to practice law was suspended as a consequence of chronic mismanagement leading to trust account record-keeping chaos and a very substantial trust account shortfall. Thus we conclude, as we did in *Powell,* that revocation is not warranted in this case.

Morris's violations extend beyond mere failure to observe rudimentary trust account record-keeping rules and mismanagement, however, as he engaged in dishonesty in representing that he regularly reconciled his trust account as required by a court rule. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Clarity*, 838 N.W.2d 648, 656, 663 (Iowa 2013) (considering attorney's reckless disregard for the truth in answering questionnaire in imposing a lengthy suspension). "Dishonesty, deceit, and misrepresentation by a lawyer are abhorrent concepts to the legal profession, and can give rise to the full spectrum of sanctions, including revocation." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Hall,* 728 N.W.2d 383, 387 (Iowa 2007).

Morris urges that we consider certain mitigating circumstances as well. In particular, he practiced law with his brother whose severe health

problems and eventual death were a source of great personal concern for Morris and a cause of disruption to and relocation of the law practice. Other family issues affecting Morris's judgment and concentration during the relevant period included his mother's severe health issues which required his attention.

Upon our consideration of the nature of the violations of disciplinary rules established by a clear preponderance of the evidence in this record, the purposes of lawyer discipline, and the aggravating and mitigating circumstances affecting the determination of the appropriate sanction in this case, we agree with the commission's recommendation that a suspension of six months should be imposed in this case.

**V. Conclusion**.

We suspend Morris's license to practice law in the State of Iowa with no possibility of reinstatement for a period of six months from the date of the filing of this opinion. This suspension shall apply to all facets of the practice of law. Iowa Ct. R. 35.13(3).

Upon application for reinstatement, Morris shall have the burden to show he has not practiced law during the period of suspension and that he meets the requirements of Iowa Court Rule 35.14. The costs of this proceeding are assessed against Morris pursuant to Iowa Court Rule 35.27(1).

**LICENSE SUSPENDED**.