# IN THE SUPREME COURT OF IOWA

No. 14–0507

Filed September 5, 2014

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

Complainant,

vs.

**DAVID S. KELSEN,**

Respondent.

On review of the report of the Grievance Commission of the Supreme Court of Iowa.

Grievance commission recommends a public reprimand. **LICENSE REVOKED.**

Charles L. Harrington and David J. Grace, Des Moines, for complainant.

David S. Kelsen, Waterloo, pro se.

**MANSFIELD, Justice**.

This matter comes before us on report of a division of the Grievance Commission of the Supreme Court of Iowa. *See* Iowa Ct. R. 35.10. The Iowa Supreme Court Attorney Disciplinary Board (Board) charged David S. Kelsen with trust account violations in representing a client. The grievance commission found that Kelsen had violated all rules as alleged by the Board and recommended that Kelsen receive a public reprimand.

On our review, we find that all of the violations took place. We also find that, among those violations, Kelsen converted $7500 of client funds to personal use without a colorable future claim to the funds. Accordingly, we revoke Kelsen's license to practice law in this state.

## I. Factual Background and Prior Proceedings.

David Kelsen is a seventy-five-year-old attorney. He has been practicing law in Iowa since 1962. He currently works as a sole practitioner in Waterloo.

This case involves Kelsen's alleged mishandling of client funds in the course of his representation of Matthew Cox. Cox came to Kelsen in February 2012 for legal assistance. Cox anticipated losing his job and believed he might have a legal claim against his employer.

On February 13, Kelsen and Cox signed an engagement letter for legal representation at an hourly rate. The agreement required a retainer of $1000 and specified that fees were "normally based on an hourly rate of $150.00 per hour for routine matters, and on an hourly rate of $250 for court presence and preparation."

Cox gave Kelsen a check for $1000, which Kelsen deposited in his client trust account. Kelsen, according to his own testimony, "got to work immediately." As Kelsen put it, "The emails started to go; I'm

getting telephone calls [from Cox] all day long." Kelsen also provided legal advice to Cox's personal consulting company.

In early March, Kelsen withdrew the entire $1000 from the client trust account in two separate transactions. Kelsen claimed that at the time he withdrew the funds, he had earned them. Kelsen acknowledged, however, that he did not keep any records of the time he was devoting to the Cox matter.

On March 9, Cox brought Kelsen another check, this one for $2000. Cox wrote "attorney retainer" on the check. Kelsen did not deposit that check in his trust account but, instead, on March 12 ran it through another account. Kelsen, however, did take $900 in cash from the $2000 and put in his trust account. Kelsen kept the remaining $1100 which he claimed he had earned as of March 12.

The next day, March 13, Kelsen withdrew $150 in cash from his client trust account. On March 16, Kelsen withdrew an additional $500.

On April 18, Cox gave Kelsen another $2000 check. According to the handwritten byline on the check, this was for "legal representation." Kelsen cashed the check at Cox's bank and again deposited only a part of the proceeds—this time $1000—into his trust account. As before, Kelsen maintained that he had kept what he had earned and deposited into the trust account the remainder that he had not yet earned.

On April 24, Kelsen withdrew another $500 of the Cox funds from the trust account. This left a Cox-related balance of $750 in Kelsen's client trust account.

While Kelsen was making these various withdrawals from his client trust account, he never notified Cox he was doing so or provided Cox with a contemporaneous accounting.

By late June, Cox had permanently lost his job and was apparently ready to file suit against his former employer if necessary. Kelsen himself was in difficult financial circumstances. He owed his landlord $3300 and had some other office expenses that needed to be paid.

Cox gave Kelsen a check for $7500. He had written out the check on June 28; it is not clear whether he gave it to Kelsen that day or on the 29th. The memo line of the check as completed by Cox said, "Advance payment for deposition, discovery, etc."

Kelsen also sent a contingent-fee agreement to Cox, signed by Kelsen and hand-dated by him June 29. The agreement recited that Cox was retaining Kelsen to file suit against Cox's employer. Under "expenses," the agreement said Cox would be responsible for all expenses incurred and that "Client shall advance the sum of $7500 to Attorney on June 29, 2012."

Kelsen did not deposit Cox's $7500 check in his trust account. Instead, on June 29, Kelsen put it in his business account and immediately used $3300 to pay his landlord that day. The balance of the $7500 was used by Kelsen to cover other expenses unrelated to Cox's potential lawsuit.[1]

On or about July 7, after having consulted with another attorney, Cox decided to terminate Kelsen's services. He asked Kelsen to return the $7500. Kelsen reached an agreement to repay Cox at the rate of $1000 per month beginning September 1. Kelsen made the September and October payments as agreed but failed to make the November and

---

[1]Kelsen testified he used the remaining $4200 to pay office telephone bills and "other things that [he] had incurred as office expense." However, the bank statements admitted into evidence end on June 30, so we do not have documentation as to how the remaining $4200 was spent. Kelsen does not claim any of the $7500 was used to pay legal expenses related to the Cox matter.

December payments. This resulted in the filing of a disciplinary complaint against Kelsen. Kelsen eventually repaid the full $7500 by May 2013.

The Board filed its complaint against Kelsen on September 9, 2013. The complaint described Kelsen's handling of the different Cox transfers of money and alleged that Kelsen had failed to notify Cox of the time, amount, and purpose of withdrawals from the client trust account; failed to provide accountings; failed to deposit advance payments into the trust account; and failed to promptly return funds to Cox after Cox terminated Kelsen's representation. The complaint concluded with allegations that Kelsen had violated Iowa Rules of Professional Conduct 32:1.15 (safekeeping of property) and 32:1.16(d) (terminating representation) and Iowa Court Rules 45.1 (client trust account), 45.2 (action required upon receiving funds, accounting, and records) and 45.7 (advance fee and expense payments). Kelsen filed his answer on October 3, admitting all allegations of the complaint.

Kelsen was served with interrogatories, requests for admissions, and requests for production of documents on September 13. He did not respond to these items, and on November 25, the Board filed a motion to compel. Kelsen did not resist the motion to compel, and on December 12, the commission ordered Kelsen to respond to the interrogatories and the production requests by December 27 or face sanctions. Because Kelsen had not responded to the Board's requests for admissions, the matters were deemed admitted. *See* Iowa Rs. Civ. P. 1.510(2), 1.511; Iowa Ct. R. 35.6. Kelsen subsequently answered the interrogatories and responded to the requests for production.

A hearing took place before the grievance commission on January 29, 2014. The Board did not call any witnesses. Kelsen testified on his own behalf.

Kelsen emphasized a number of family difficulties he was facing in 2012. His wife had lost her job and was dealing with serious health problems. Kelsen's secretary had left, and Kelsen did not replace her because of his financial constraints. A stepson had used forged checks to take funds from Kelsen's law firm.

Kelsen testified that Cox understood the $7500 would be used not only for case-related expenses, but also for expenses related to the operation of Kelsen's office. As he put it,

> I owed [my landlord] $3,300, plus I had some other office expenses that needed to be paid, just your routine office expenses. And so Mr. Cox agreed to make the $7,500 payment; this was not solely to be used for the discovery and other expenses in conducting the case itself, but . . . it was his intention that I use those funds to make these payments. He knew that up front. The reason he knew it is because I had attempted to get a loan from the bank, but because of the problem I had with the banks because of the [stepson's] forgery things and having to change banks, I was not able to get a loan. And so Mr. Cox agreed to—from the time that he paid me the $7,500 to allow me to use funds directly for the payment of those expenses that I had incurred, much of which had incurred during the time when I was actively representing him starting in February. So he was very aware of it, and consented to it. In fact, on the day he actually made the payment, he left my office in the morning, he went back to his house and visited with his wife about it because he wanted her to understand what he was doing and why. He was doing it, I think, not only because of the needs for the representation matter, but he was doing it because he felt it was something that he could do for me personally. And he's a Christian person, and he was acting in a way that he thought would be helpful, but it was also a contractual matter in that what the intention was here is that I would actually repay him for any of the expense that was made from that $7,500 payment that he made from the proceeds, from the recovery from the suit. It was our anticipation that settlement would take place fairly quickly, and that we might not even have to file the petition because we were going to

start negotiations with [the employer] and their counsel immediately upon the termination situation.

When asked by a commission member why the proposed contract he sent to Cox did not mention preexisting office expenses, Kelsen said this was because he used a "bar form for an attorney fee contract that was available." He explained, "I was working on my computer at home trying to do this about 11:00 at night in order to get something in place on that that would basically confirm what we had agreed to."

Kelsen testified that he would generally provide an accounting to his clients with his monthly billing. He was familiar with the rules on client trust accounts, and as a longtime practitioner, had met with representatives from the client security commission several times.

Kelsen characterized his failure to deposit all funds into the client trust account as a "clerical matter" and explained that the funds were not routed through the trust account for reasons of "convenience"—he needed to cash the checks in order to make past-due payments. Kelsen testified that he never intended to take money from a client and use it for personal expenses without the client's knowledge.

The commission issued its findings of fact, conclusions of law, and recommended sanction on March 27, 2014. The commission concluded that Kelsen had committed all ethical violations alleged by the Board. The commission expressed skepticism about Kelsen's claim that the $7500 was intended to be a loan for Kelsen's office expenses, stating,

> The panel cannot know for certain whether or not that is true, because Mr. Cox did not testify before the panel, but the panel *does* harbor grave doubts about the veracity of that testimony. First, the "memo" line on Mr. Cox's check reads, "Advance payment for Deposition, Discovery, etc.," and no loan is referenced. Second, a written loan agreement does not seem to exist, and one would expect such an agreement to be in writing. Third, as will be seen, within just a few days of June 29, 2012, Mr. Cox actually asked for

that money back, which is not consistent with the amount being a personal loan from Mr. Cox to Mr. Kelsen.

While stating that it understood Mr. Kelsen's personal situation, the commission noted that personal difficulties do not excuse trust account violations. Still, as a mitigating factor, the commission took into account Kelsen's lack of prior ethical violations. It also presumed that Kelsen had been through several successful trust account audits in the past. The commission ultimately recommended a public reprimand as a sanction.

## II. Standard of Review.

We review attorney disciplinary proceedings de novo. Iowa Ct. R. 35.11(1); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Conroy*, 845 N.W.2d 59, 63 (Iowa 2014). The Board has the burden to prove attorney misconduct by a convincing preponderance of the evidence, a burden greater than a preponderance of the evidence but less than proof beyond a reasonable doubt. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Thomas*, 844 N.W.2d 111, 113 (Iowa 2014).

We give the commission's findings and sanction recommendations respectful consideration but are not bound by them. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Ricklefs*, 844 N.W.2d 689, 696 (Iowa 2014). We give deference to the commission's credibility determinations because the commission has the opportunity to observe the demeanor of the witnesses. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Ouderkirk*, 845 N.W.2d 31, 33 (Iowa 2014).

If we conclude there has been a rule violation, "our determination of the appropriate sanction is guided by the nature of the alleged violations, the need for deterrence, protection of the public, maintenance of the reputation of the bar as a whole, and [the attorney's] fitness to

continue in the practice of law." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Laing*, 832 N.W.2d 366, 367–68 (Iowa 2013) (internal quotation marks omitted).

### III. Review of Alleged Ethical Violations.

Kelsen stipulated that he had violated Iowa Rules of Professional Conduct 32:1.15 and 32:1.16(d) and Iowa Court Rules 45.1, 45.2 and 45.7. An attorney's stipulation as to a violation is not binding on us. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. McCarthy*, 814 N.W.2d 596, 601 (Iowa 2012). However, upon our own review, we conclude that Kelsen violated all of the foregoing rules.

Rule 32:1.15(a) requires a lawyer to "hold property of clients . . . that is in a lawyer's possession in connection with a representation separate from the lawyer's own property." Iowa R. Prof'l Conduct 32:1.15(a). Rule 32:1.15(c) requires a lawyer to "deposit into a client trust account legal fees and expenses that have been paid in advance, to be withdrawn by the lawyer only as fees are earned or expenses incurred." *Id.* r. 32:1.15(c). Kelsen did not deposit several of Cox's advance payments, including the $7500 check, into his trust account. Nor did he keep those payments separate. Hence, he violated both rules.[2]

Rule 32:1.16(d) obligates an attorney to return any unearned advance payment of fee or expense upon termination of representation. *Id.* r. 32:1.16(d). Kelsen did not return the unearned $7500 when he was discharged by Cox. Because Kelsen had spent the money, he had to

---

[2]Rule 32:1.15(f) also incorporates chapter 45 which, as we discuss herein, Kelsen independently violated. *See* Iowa R. of Prof'l Conduct 32:1.15(f) ("All client trust accounts shall be governed by chapter 45 of the Iowa Court Rules.").

enter into a payment plan with Cox. Thus, Kelsen violated rule 32:1.16(d).

Chapter 45 contains various trust account requirements. Rule 45.1 requires attorneys to deposit funds received from clients in trust accounts and allows them to withdraw amounts that belong to them only when due. *See* Iowa Ct. R. 45.1(2). Rule 45.2 imposes recordkeeping duties, directing attorneys to maintain receipt and disbursement journals and ledger records for client trust accounts. *See id.* r. 45.2(3)(*a*)(1), (2). Additionally, rule 45.7 requires attorneys to provide written notification to the client "of the time, amount, and purpose of any withdrawal" from a client trust account, together with a written accounting. *See id.* r. 45.7(4). It is undisputed that Kelsen violated all these rules. He failed to deposit some of the funds received from Cox in his client trust account, failed to keep journals and ledgers showing deposits and withdrawals to and from the trust account, and did not provide contemporaneous accountings to Cox as he withdrew funds.

### IV. Consideration of Appropriate Sanction.

We now need to determine the appropriate sanction. There are different gradations of trust account violations. As we have recently emphasized, an attorney crosses an important line when he or she misappropriates or converts client funds without a "colorable future claim" to those funds. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Carter*, 847 N.W.2d 228, 232 (Iowa 2014); *Thomas*, 844 N.W.2d at 117. If an attorney takes that step, it is tantamount to stealing from the client, and we revoke the attorney's license. *See Carter*, 847 N.W.2d at 233–34; *Thomas*, 844 N.W.2d at 117–18. Later restitution of client funds does not preclude us from revoking the attorney's license. *Thomas*, 844 N.W.2d at 118.

In *Carter,* we revoked the license of an attorney who converted estate assets from his office trust account when we concluded that he had no colorable future claim to the funds. 847 N.W.2d at 234. Though Carter claimed he had earned the money, there was seemingly no relationship between the amount he withdrew and the amount he could actually earn for his work, and the timing of the withdrawals was inconsistent with a bona fide intent to take the funds as payment for legal services. *Id.* Further, Carter had not received court approval for the withdrawals, as required in probate. *Id.* We noted that "a bare claim that *some* of the funds w*ould have been* earned" without more is not sufficient to constitute a colorable-future-claim defense. *Id.* Due to Carter's failure to come forward with credible evidence supporting his claim that he had a right to the client money he withdrew, we concluded he had no colorable future claim to the funds. *Id.*

In *Thomas,* we revoked the license of an attorney who withdrew more than his share of a contingent-case settlement from the trust account. 844 N.W.2d at 117–18. After the case had settled, Thomas took $6100 more than his agreed-upon fee and did not disburse any of the settlement funds to the client for another nine months. *Id.* at 114–15. Similar to the present case, Thomas admitted and the evidence demonstrated that he had used the client funds for his own personal use including payments for Dish Network at his office and on his home mortgage. *Id.* at 115, 117.

There is no question that Kelsen violated trust account rules by failing to deposit the $7500 check in his client trust account and instead utilizing the money to pay general office expenses. We need to consider whether Kelsen misappropriated or converted those funds without a colorable future claim. At this stage we do not need to examine Kelsen's

handling of Cox's earlier payments, because if Kelsen took Cox's $7500 for his own use and benefit without a colorable future claim to it, revocation follows as a sanction.

Regarding the $7500, the Board took the position at the hearing that it involved "conversion" and "misappropriation" and "should be treated quite seriously," although the Board did not ask for revocation of Kelsen's license. Kelsen responded that his client

> knew in advance what we were going to do; it was part of the reason he paid it [the $7500], and the very purpose for which he paid it is how the money was spent. That's a stretch to call that a conversion.

The commission "harbor[ed] grave doubts about the veracity of [Kelsen's] testimony" concerning the $7500, but nonetheless recommended only a public reprimand.

In its statement regarding sanction to this court, the Board asserts that Kelsen had "no authority to use the [$7500] for any purpose other than litigation expenses." It adds, "In view of the foregoing, the sanction recommended by the Commission [i.e., reprimand] may be on the light side, since the actions of Respondent are considered misappropriation and conversion under the decisions of this Court."[3]

---

[3]As noted above, the Board's complaint alleges violations of various trust account rules, including rule 32:1.15. Complaints filed with the grievance commission are required to be "sufficiently clear and specific in their charges to reasonably inform the attorney against whom the complaint is made of the misconduct alleged to have been committed." Iowa Ct. R. 35.5. Because attorney disciplinary actions are "quasi-criminal" in nature, "the charge[s] must be known before the proceedings commence." *In re Ruffalo*, 390 U.S. 544, 551, 88 S. Ct. 1222, 1226, 20 L. Ed. 2d 117, 122 (1968); *see Iowa Supreme Ct. Att'y Disciplinary Bd. v. Nelson*, 838 N.W.2d 528, 536 n.2 (Iowa 2013) (citing *Ruffalo* and noting that "the board must disclose the charges against an attorney before the proceedings commence").

While the Board's complaint did not expressly allege that Kelsen had misappropriated client funds, it did clearly cover Kelsen's handling and misuse of Cox's $7500. The complaint alleged that Kelsen failed to deposit Cox's $7500 check in his trust account, that Kelsen had already spent the money when Cox asked for it back one

"[A]n attorney in a disciplinary proceeding bears the burden of coming forward with evidence of a colorable future claim, but the burden to prove conversion remains with the Board." *Carter*, 847 N.W.2d at 232–33. Kelsen met the burden of coming forward by providing evidence, namely, his own testimony. We thus need to determine, on our de novo review, whether the Board proved by a convincing preponderance of the evidence that Kelsen had no colorable future claim to use the $7500 to pay his office rent and other office-related costs.

On our review, we find a convincing preponderance of the evidence disproves Kelsen's contention that he had an oral arrangement permitting him to use the $7500 cost retainer to pay office bills. The commission made three observations; we agree with all of them. First, the document drafted by Kelsen and furnished to Cox stated the $7500

---

week later, and that Kelsen had violated rule 32:1.15. These allegations were sufficient to put Kelsen on notice that the Board believed Kelsen had not safeguarded his client's $7500 as required by rule 32:1.15. *See Comm. on Prof'l Ethics & Conduct v. Hurd*, 325 N.W.2d 386, 389 (Iowa 1982) (holding that a complaint put an attorney on notice of charges of deceit when the complaint alleged that the attorney altered a copy of a venue motion and filed it with the court and that the alteration was made without consent or knowledge of the country attorney or magistrate). In short, the issue here is one of the appropriate *sanction* for an alleged ethical violation as to which the respondent was clearly on notice, both as to the factual circumstances and as to the relevant rule allegedly violated. Furthermore, Kelsen understood the centrality of the colorable claim question. Much of his testimony, discussed above, was devoted to trying to establish a colorable claim defense. The Board disputed that testimony.

While we believe it would be better practice for the Board to specifically allege in its complaint that a respondent misappropriated or converted client funds for personal use if its investigation supports such an allegation, we do not believe the absence of a specific reference to misappropriation in the complaint is critical here. Again, the Board's complaint included both the relevant facts and the relevant legal rule regarding the mishandling of the $7500, and the question of misappropriation of those funds was certainly a focal point of the hearing. This strikes us as analogous to *Committee on Professional Ethics & Conduct v. Wunschel*, 461 N.W.2d 840, 847 (Iowa 1990) (finding no due process violation where "Wunschel was well aware of the incident leading to this prosecution"), rather than *Iowa Supreme Court Attorney Disciplinary Board v. Rickabaugh*, 728 N.W.2d 375, 380 n.3 (Iowa 2007) (declining to consider misrepresentations that were revealed in the record but not charged in the complaint).

was to be used as a cost retainer and did not mention any other purpose. Second, Cox's notation on the check said it was for costs of the litigation, not office overhead. Third, Cox's prompt demand for return of the entire $7500 was inconsistent with Kelsen's claim that Cox had agreed to lend him the money.

To this list we add a fourth item noted by the Board. The Board alleged in its complaint that the $7500 check was "intended to be an advance for expenses." Kelsen admitted this allegation.

Additionally, Kelsen's hearing testimony had a few twists and turns, which led the commission and lead us to question Kelsen's credibility. In the hearing, Kelsen equivocated as follows:

> Q. So you and he both knew that $7,500 was an advance on expenses; right? A. Partially.

> Q. Well, as far as he was concerned, it's an advance on expenses? A. Right.

> Q. But you're claiming that both you and he knew that you were going to use some of this money for back rent, for instance? A. Right.

> Q. But he's not—As far as his rights are, this is an advance on expenses? A. Part of the problem here is that I was trying to use a form in which we were simply trying to put information into categories that were on the form.

Kelsen later claimed that "a part of the funds" were to be used for case expenses and that the contingent-fee contract simply failed to reflect that part were going to be used to cover office expenses. Kelsen also asserted that he had taken "a bar form contract form and tried to revise it on the spot on a Sunday night to get something in place" to "basically confirm what [he and Cox] had agreed to."

We note some problems with this version of events. For one thing, if *part* of the funds were to be used for case expenses, this raises a

question why Kelsen was unable to return *any* of those funds when Cox asked for his money back. Kelsen claimed at the hearing that when Cox discharged him and asked for the $7500 back, Cox also agreed Kelsen could wait until September to start repaying him and thus "could use the balance of the funds that hadn't been expended to cover other expense because [Cox] knew [Kelsen] needed that." But without documentary support, this story comes across as implausible.

Furthermore, June 29—the date when Kelsen put the $7500 in his bank account and used $3300 to pay his landlord—was a Friday. Thus, it is unclear why Kelsen would have been working hurriedly late on a Sunday night "to get something in place." Additionally, the document he created bears his handwritten date of June 29, which again was a Friday.

To bolster his claim of an informal lending arrangement, Kelsen asked the commission to consider that $7500 is a large amount for a cost retainer in a wrongful-termination case. That may be true, but it is not apparent from the record why Cox would know that. Of course, it would have been helpful if Cox had testified at the hearing. But in this context, it is fair to ask why Kelsen did not call Cox as a witness, since Kelsen knew the document trail did not support Kelsen's version of events.

Even if we discount Kelsen's claim that he had specific oral permission to tap into Cox's $7500 for office expenses, we need to consider another possible theory that could give him a colorable future claim. Kelsen asserted at the hearing that he and Cox anticipated a quick monetary settlement of the wrongful-discharge claim, which would have netted Kelsen a contingent fee sufficient to cover anything he borrowed from the $7500. Thus, the argument would run that Kelsen

had at least a "colorable future claim" to the $7500, because he expected a settlement from which his fee would be at least $7500.

This argument needs to be unpacked with some care. On the one hand, we should be wary of discriminating against contingent-fee attorneys. We generally do not revoke the licenses of hourly rate attorneys who take client funds for personal use before they have done the work but in anticipation of doing so. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Boles*, 808 N.W.2d 431, 441–43 (Iowa 2012) (suspending the license of a criminal defense attorney for thirty days who among other things "withdrew unearned fees"); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Parrish*, 801 N.W.2d 580, 586–87, 590 (Iowa 2011) (suspending a criminal defense attorney's license for sixty days for several instances of failing to timely refund unearned fees to a client and withdrawing fees from a trust account before they were earned); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. McCann*, 712 N.W.2d 89, 97 (Iowa 2006) (imposing a suspension on a family law practitioner while finding revocation "not warranted" when "[t]he stipulated facts indicate McCann had a colorable future claim to the funds he converted").

Unlike an hourly rate attorney, a contingent-fee attorney earns his or her fee by settling or winning the case rather than by putting in time. If we are going to credit the hourly rate attorney's claim that she was going to earn future fees by putting in time (at least to the extent that we will not revoke her law license), why not credit the contingent-fee attorney's claim that she was going to earn future fees by settling or winning the case?

Today, we decide only the case before us. We do not foreclose the possibility that a colorable-future-claim defense could be asserted by a contingent-fee attorney in other contexts. However, we find that Kelsen

did not have a colorable future claim to the $7500 cost retainer here for several reasons. First, his testimony that he expected a prompt settlement of Cox's wrongful-discharge claim was vague and lacked corroborating detail. One might ask: If Kelsen expected a rapid settlement, why would he need a $7500 retainer? Second, the retainer in question was for costs only, not fees. Thus, it differs from the fee *and* cost retainers that were the subject of the *Boles, Parrish,* and *McCann* proceedings. While future fee withdrawals from those retainers were contemplated, future fee withdrawals from this retainer were not. Otherwise stated, the attorneys in those three cases could argue that they merely made premature *withdrawals*, whereas Kelsen had at most an argument that he expected to generate an *offset* in the future. Third, Kelsen did not have a signed contingent-fee contract with his client at the time he converted the $7500. *See* Iowa Ct. R. 32:1.5(c) (providing that a contingent-fee agreement "shall be in a writing signed by the client"). This further erodes any colorable-future-claim argument based on the possibility of a future contingent fee.

For the foregoing reasons, we find by a convincing preponderance of evidence that Kelsen's trust account violations included the conversion of $7500 worth of client funds without a colorable future claim to those funds. Kelsen's claim of an oral loan agreement is not credible, and we also reject his contention that, even without a loan agreement, he would have a colorable future claim to the funds based on an expected contingent case settlement. "This conduct alone is enough to support revocation, and it is unnecessary for us to further consider the impact of his other unethical conduct." *Carter*, 847 N.W.2d at 234.

**V. Disposition.**

We order the license of David S. Kelsen to practice law in this state to be revoked effective with the filing of this opinion. Kelsen shall provide all of the notifications required by Iowa Court Rule 35.23. The costs of this proceeding are assessed against Kelsen as provided in Iowa Court Rule 35.27(1). *See Carter*, 847 N.W.2d at 234; *Thomas*, 844 N.W.2d at 118.

**LICENSE REVOKED.**