# IN THE SUPREME COURT OF IOWA

No. 19–1032

Filed October 25, 2019

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

Complainant,

vs.

**TINA HASSANE MUHAMMAD,**

Respondent.

---

On review of the report of the Iowa Supreme Court Grievance Commission.

The grievance commission recommends a one-year suspension of an attorney's license to practice law for multiple violations of ethics rules, including theft from a client without colorable claim. **LICENSE REVOKED.**

Tara van Brederode, Des Moines, for complainant.

Tina Hassane Muhammad, Chicago, Illinois, pro se.

**APPEL, Justice.**

In this disciplinary matter, we consider whether a lawyer's depositing of $7500 advanced by a client into a personal account amounts to theft as alleged and, if so, whether the lawyer can avoid revocation by showing that she had a colorable claim to the funds.

The Iowa Supreme Court Attorney Disciplinary Board (Board) sought revocation of the lawyer's license to practice law. After a hearing, the Iowa Supreme Court Grievance Commission (commission) concluded that the lawyer received the funds for expense purposes in connection with a potential legal claim but that the funds were deposited into the lawyer's personal account. The commission also found that the lawyer did not have a colorable present or future claim to the funds. After balancing aggravating and mitigating factors, the commission recommended the lawyer's license be suspended for one year. The commission further recommended that we require reimbursement of the $7500, that we require the lawyer to obtain a mentor, that the lawyer undergo at least six hours of continuing legal education related to trust account and fee retainer agreements, and that the lawyer continue to comply with our minimum continuing legal education requirements during the period of suspension.

Based upon our de novo review, we revoke the lawyer's license to practice law.

**I. Factual and Procedural Background.**

**A. Introduction.** Tina Muhammad is a licensed Iowa lawyer. Prior to becoming a lawyer, Muhammad was a stay-at-home mother and worked for a period of time outside the legal profession. She graduated from law school in 2015 and was admitted to the Iowa bar in 2016. During her law school years, Muhammad worked with Black Lawyers for Justice in

support of their nationwide efforts against police brutality and served as an assistant on cases.

At the time she obtained her Iowa law license, Muhammad was employed as a compliance officer with a Des Moines-based company. She left her employment there in the summer of 2016, and in August 2016, she entered solo practice focusing on family and criminal law. At the time of the disciplinary hearing in this case, Muhammad was employed by Upright Law, a Chicago law firm specializing in bankruptcy matters. She also on occasion performed contract work reviewing documents. Muhammad has no prior disciplinary history.

Rachel Peebles is a resident of the State of Washington. She currently resides in Tacoma. Peebles' son was a mental health patient at Harborview Medical Center in Seattle, Washington. On August 12, 2014, an incident allegedly occurred at Harborview which formed the basis for Peebles' personal injury/civil rights matter against Harborview and other related parties. In August of 2016, Peebles contacted Muhammad in Iowa regarding potential legal representation in this matter.

**B. Nature of Complaint.** On July 26, 2018, the Board filed a complaint against Muhammad. The Board alleged that in the summer of 2016, Peebles conducted an internet search to find an attorney to evaluate whether she had sufficient grounds to bring a personal injury and civil rights lawsuit against Harborview Medical Center, the State of Washington, the University of Washington, and the Seattle Police Department. According to the Board, Peebles located Muhammad through an online advertisement and paid her a $250 retainer to evaluate her case.

Peebles allegedly told Muhammad that she did not want an attorney licensed in Washington to represent her. The Board asserted Muhammad advised Peebles that there were grounds to bring a personal injury and

civil rights lawsuit in Washington arising from the alleged incident. The Board claimed that Peebles and Muhammad executed a contingency fee agreement (Agreement) regarding the personal injury/civil rights claim.

Pursuant to the Agreement, the Board alleged that Peebles paid Muhammad $7500 in advance for expenses in connection with the personal injury/civil rights representation. According to the Board, Muhammad deposited the funds in a nontrust account. The Board claimed that when Peebles severed the attorney–client relationship with Muhammad, she requested an accounting of the $7500 advanced for expenses. The Board stated that no accounting was forthcoming and that none of the $7500 was returned to Peebles.

The Board alleged that Muhammad violated Iowa Rules of Professional Conduct 32:8.4(b) (criminal acts) and 32:8.4(c) (honesty, fraud, deceit, and misrepresentation). Specifically, the Board alleged,

> 17. Muhammad used the $7,500 expense retainer for purposes other than for the specific purpose for which it was paid as set forth in the Agreement.
>
> 18. Muhammad did not have a colorable future claim to the $7,500, as it was for the specific purpose of paying expenses, and instead knowingly converted the funds in violation of Iowa Code §§ 714.1(2) and 714.2(2).

The conversion and lack-of-colorable-future-claim allegations are sufficient to comply with Iowa Court Rule 36.8(1).[1]

The Board also alleged a series of trust account violations. Specifically, the Board alleged violations of Iowa Rules of Professional

---

[1]Iowa Court Rule 36.8(1) provides, in relevant part,

*Allegation of misappropriation or conversion.* If the complainant intends to assert that a respondent misappropriated or converted client or third-party funds in violation of rule 32:1.15 or chapter 45 of the Iowa Court Rules, the complainant must specifically allege in the complaint the respondent's misappropriation or conversion for personal use was without a colorable future claim to the funds.

Conduct 32:1.15(a) (holding funds in separate accounts), 32:1.15(c) (depositing advance legal and expense fees in trust account), 32:1.15(d) (safekeeping and prompt delivery of property), and 32:1.15(f) (complying with chapter 45 of the Iowa Court Rules).

Muhammad answered the Board's complaint. She asserted that Peebles agreed to pay her a $15,000 flat fee to assist in the settlement of a separate action related to public disclosure of video footage but not for expenses associated with her potential personal injury/civil rights claim. Thus, according to Muhammad, the payment of the $7500 was "already earned."[2] Muhammed asserted that she pulled the Agreement off the Internet and that it was "all wrong for this case." She asserted that the Agreement "is very confusing and seems to allude that [she] charged [Peebles] $7500.00 for expenses, but that is incorrect."

On the trust account issue, Muhammed claimed she put the $7500 she received from Peebles in what she thought was a client trust account. Muhammad claimed the account was improperly set up by bankers, a fact she claimed she did not know until she prepared her yearly client security questionnaire.

---

[2]Iowa Court Rule 36.8(2) states, in relevant part,

*Colorable future claim.* A respondent who intends to rely on the defense of a colorable future claim to funds taken from a trust account to avoid a finding of misappropriation must, within the time set for making of pretrial motions or at such later time as the division president directs, file written notice of such intention. . . . The respondent bears the burden of coming forward with evidence in support of a colorable future claim, but the burden to prove conversion remains with the complainant.

Notice in the answer is sufficient to comply with the rule. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Moran*, 919 N.W.2d 754, 757 (Iowa 2018). Although the answer does not specifically use the term "colorable claim," it is sufficient to give the Board notice of the respondent's claim that the fees were, in fact, earned. Thus the respondent has complied with the court rule.

Muhammad admitted that she did not provide Peebles with an accounting in connection with the $7500 payment. Regarding her ability to provide an accounting to Peebles, Muhammad asserted that she failed to keep track of her time. Muhammad affirmatively pled that she helped get Peebles a settlement in the public disclosure case, contacted attorneys regarding a trust account for Peebles, helped Peebles get visitation rights to the facility where her son was confined, and negotiated a release for her son. According to Muhammad's pleading, Peebles called her and her paralegal "every day, and sent tons of emails and various documents." In her answer, Muhammad maintained that not only did she earn the $7500 but that Peebles owed her an additional $7500.

Muhammad denied the Board's allegation that she had no colorable claim to the $7500. She repeated her insistence that the funds were not for expenses related to her potential personal injury/civil rights claim. According to Muhammad, "I never converted funds knowingly, that is not true. . . . [M]y intentions were good and remained good, it was my paperwork that was lousy. I admit that." In effect, Muhammad admitted that she violated rule 32:1.15(f) (complying with Iowa Code chapter 45) but denied the remainder of the Board's alleged violations.

## II. Proceedings Before the Commission.

**A. Sanction for Pretrial Noncompliance and Motion to Continue.** In its scheduling order, the commission established November 6, 2018, as the deadline for the filing of exhibits, exhibit lists, and witness lists. The scheduling order provided that a hearing on the matter would be held on November 29–30, 2018.

Muhammad did not timely file the required documents on November 6. Further, on November 9, Muhammad did not participate in

a hearing on the question of whether the testimony of Peebles could be taken by telephone.

On November 13, counsel for the Board sent an email to Muhammed asking when the documents might be available but received no answer. In light of the lack of response, the Board on November 15 filed a motion to intervene with the panel president seeking any of the following: (1) an order prohibiting Muhammad from introducing witnesses and exhibits, (2) an order extending the deadline for witness and exhibit lists, or (3) setting the matter for hearing.

On November 16, the panel president granted the motion to intervene and extended the deadline for providing submissions to the following Monday, November 19, but warned Muhammad that if she failed to provide the documents she would be precluded from calling witnesses or offering exhibits at the hearing. Muhammad failed to file any documents under the extended deadline. On November 20, the Board filed a motion to preclude her from offering exhibits or witnesses at the hearing. That same day, the panel president granted the motion and entered an order precluding Muhammad from offering exhibits or witnesses at the hearing. *Cf. Iowa Supreme Ct. Att'y Disciplinary Bd. v. Cepican*, 861 N.W.2d 841, 843 (Iowa 2015) (holding respondent was precluded from introducing witnesses and evidence as a sanction for failing to answer the complaint or to provide discovery responses).

On November 26, Muhammad filed a motion to continue the hearing asserting hardship and the need to consult with an attorney. The Board resisted the continuance. The Board recounted Muhammad's history of noncompliance with the various orders and deadlines. The panel president denied the motion to continue.

**B. Hearing Before the Commission.** The hearing occurred on November 29 and 30, 2018. The Board called two witnesses to testify, Peebles (telephonically) and Muhammad.

Muhammad was not allowed to present a case-in-chief but only to cross-examine Peebles and herself. The commission members engaged in extensive examination of the two witnesses.

**C. Commission's Findings of Fact, Conclusions of Law, and Recommendation.**

1. *Findings of fact.* In a nineteen-page order, the commission found facts largely adverse to Muhammad. Among other things, the commission concluded that the $7500 in funds advanced by Peebles were for the purpose of paying expenses in connection with the personal injury/civil rights matter. The commission found that the funds were not placed in a client trust account; that no expenses were incurred in the personal injury/civil rights case prior to termination of representation; and that when Peebles asked for an accounting and refund of the balance, Muhammad did not respond. The commission further found that Muhammad had no colorable present or future claim to the funds.

2. *Commission's conclusions of law (violations).* Based on its review of its findings, the commission concluded that Muhammad violated Iowa Rules of Professional Conduct 32:8.4(b) and (c) when she converted Peebles $7500 expense retainer for her personal use and failed to use those funds for expenses related to the personal injury and civil rights matter. Further, citing *Iowa Supreme Court Attorney Disciplinary Board v. Parrish*, 925 N.W.2d 163, 170–71 (Iowa 2019), the commission found that Muhammad did not have a colorable future claim to the $7500 because the funds were specifically provided for expenses. In the alternative, the commission concluded that Muhammad did not have a colorable present

claim to the funds because there was no evidence—other than Muhammad's testimony—that the funds were intended to pay Muhammad for work related to the public disclosure settlement.

The commission recognized that a violation of Iowa Rule of Professional Conduct 32:8.4(c) requires some element of scienter in order to prove a violation. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Haskovec*, 869 N.W.2d 554, 560 (Iowa 2015). The commission did not expressly conclude that scienter was present; however, the commission's determination that Muhammad violated the rule necessarily implies a finding of scienter.

The commission also found violations of various rules related to trust accounts and maintenance of client funds. The commission noted Muhammad did not deposit the retainer in a trust account but put it in a personal account, thereby comingling personal assets with client funds. She further admitted that she did not keep an accounting of her work and did not have records that would warrant withdrawal of funds from the $7500 retainer. Muhammad did not refund the amount to Peebles and failed to provide an accounting of the retainer. As a result, the commission found that Muhammad violated rules 32:1.15(a), (c), (d), and (f).

3. *Commission's analysis of mitigating and aggravating factors and recommended sanction.* With respect to mitigating factors, the commission noted that Muhammad is an inexperienced attorney who opened a solo practice without a mentor. In support of finding inexperience a mitigating factor, the commission cited *Iowa Supreme Court Attorney Disciplinary Board v. Turner*, 918 N.W.2d 130, 152 (Iowa 2018). The commission noted that Muhammad's case, unlike *Turner*, involves only one mistake, not repeated mistakes, by an inexperienced practitioner.

The commission, however, also found aggravating factors. The commission noted that the case involved multiple violations of disciplinary rules which generally warrants a more severe sanction. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Baldwin*, 857 N.W.2d 195, 213 (Iowa 2014). The commission further found that Muhammad's conduct in the proceeding did not reflect a true understanding of the gravity of her actions. Specifically, the commission noted that Muhammad failed to comply with scheduling orders, failed to appear at a telephonic hearing, and sought a continuance of the hearing less than three full days before the scheduled hearing. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Netti*, 797 N.W.2d 591, 606 (Iowa 2011) (citing caselaw finding that other aggravating factors, such as failure to cooperate with the board, warrant more severe sanctions in trust account violations).

Based on the evidence and the aggravating and mitigating factors, the commission recommended that Muhammad's license be suspended for a period of one year. Before being reinstated, the commission recommended that Muhammad reimburse the $7500 to Peebles, obtain a mentor, complete a minimum of six hours in-person continuing legal education with a specific focus on trust accounts and fee/retainer agreements, and maintain the mandatory continuing legal education requirements during the period of suspension.

**D. Statement on Sanctions.** After the entry of the commission's findings of fact, conclusions of law, and recommendation, Muhammad did not file an appeal. The Board did not file a brief with this court regarding the proper sanction that should be imposed on Muhammad.

Muhammad filed a statement with this court regarding sanctions, asking for leniency. She stated that her errors were due to a lack of experience and knowledge, insisting, "I earned those funds. We agreed to

$15,000.00 when we settled her [public disclosure] case." According to Muhammad, the commission did not give "any weight to my prior legal work for [Peebles] or the settlement I got her." She admitted the Agreement was "a mishmash of contradictory statements," but averred that she had earned the funds and denied that she intentionally took client funds.

**III. Discussion.**

**A. Findings of Fact.** Based on our de novo review of the record, we find the following facts.

1. *Initial attorney–client relationship.* Muhammad in the summer of 2016 opened a solo practice in Des Moines, eventually named Justice Law, PLLC. Muhammad's law practice focused on family law and criminal law.

During the summer of 2016, Peebles sought an attorney to evaluate whether she had sufficient grounds to bring a personal injury/civil rights lawsuit against the State of Washington, the University of Washington, the Seattle Police Department, and Harborview Medical Center related to an incident in which Peebles and her son were allegedly "tased" at Harborview. Peebles wanted an out-of-state attorney for her personal injury and civil rights lawsuit.

In August of 2016, Peebles found an online article about Muhammad and reached out to her online. Peebles completed and submitted an electronic form and paid Muhammad a $250 fee for an initial one-time consultation to evaluate the merits of a personal injury and civil rights lawsuit and review documents related to the lawsuit. Muhammad advised Peebles the same day that Peebles had grounds to bring the personal injury and civil rights case. During the initial phone consultation, Muhammad and Peebles discussed a $2000 retainer for the personal injury and civil rights litigation. Muhammad subsequently requested a retainer of $15,000.

At the time Peebles was consulting Muhammad about the potential personal injury and civil rights claim, Peebles encountered legal issues surrounding the settlement of what the record characterizes as "a public disclosure case." This matter was handled by a Washington state attorney, Katherine George.

With respect to the public disclosure claim, Harborview had agreed to pay Peebles $55,000 and to provide video footage regarding an incident involving Peebles and her son at the facility. Settlement documents included multiple signature dates from August 31 to September 2, 2016. Muhammad reviewed the settlement agreement to ensure that the release language would not preclude the contemplated personal injury/civil rights claim. Muhammad also advised Peebles to execute the final agreement notwithstanding Peebles' concerns about the impact of the settlement on Peebles' eligibility for Medicaid and housing assistance. Because of the potential implications of the release, and the ultimate acquiring of video relating to the tasing incident, the public disclosure claim was directly related to the proposed representation of Muhammad in the personal injury/civil rights claim.

2. *October 26 invoices.* On October 26, 2016, Muhammad sent Peebles two invoices: one for $250 and another for $1000. One invoice was for a letter that Muhammad sent on behalf of Peebles to a Washington state hospital administrator relating to Peebles' ability to visit her son and to questions relating to alleged assaultive behavior. The second invoice did not provide an itemization of services but equaled four hours of work at Muhammad's hourly rate. According to Muhammad, the work related to the invoice included working with Peebles to lift a ban on Peebles from visiting her son, the terms and conditions of her son's discharge from the hospital, and review of her son's medical records. Muhammed reasonably

believed these services were part and parcel of the personal injury/civil rights claim. At that point in time, Peebles and Muhammad had not yet signed a contingency fee agreement related to the personal injury/civil rights case.

Muhammad observed that she sent the invoices "to kind of see whether or not [Peebles] was going to pay me for the legal services that I had been performing for her." Muhammad further testified that at the time she sent the invoices, she "had to pay her paralegal as well." Following receipt of the invoices, Peebles and Muhammad, however, agreed that payment of these services would occur through a contingency fee for the personal injury/civil rights case once an agreement was executed. Muhammed sent Peebles no other invoices after the execution of the Agreement at the end of November.

3. *Drafting and execution of the Agreement in personal injury/civil rights matter.* With respect to the personal injury/civil rights case, Muhammad first drafted the Agreement in August 2016. Muhammad found an agreement exemplar online and revised it for use in connection with Peebles' representation. Muhammad revised paragraphs related to the purpose of the agreement and retainer provisions to fit her work for Peebles.

Muhammad sent the Agreement to Peebles in November. The Agreement was signed by Peebles and dated November 22, 2016. Peebles returned the signed Agreement to Muhammad with a $7500 check in the same envelope. The check bore the notation "legal expenses." Muhammad signed the Agreement on November 28, 2016, and she deposited the $7500 in her personal bank account.

4. *Terms of the Agreement.* The Agreement signed by the parties stated that the "client(s) believe(s) that (s)he may have a claim or cause of

action for civil rights and personal injury violations against the University of Washington, Harborview Hospital, the State of Washington, Seattle Police Department or any other person, firm, or corporation that may be liable . . . ." The parties agreed that the law firm "will proceed as it shall deem appropriate to effect a recovery for any and all civil rights and personal injury claims that has been sustained by client(s)."

The Agreement further provided that upon the signing of the agreement, the client shall pay to the law firm

> the sum of $7,500.00 that shall be applied upon account for expenses as needed, to obtain photographs or recordings, police reports, to secure records and documents, fees for expert witnesses, and the cost of service of notice of suit and filing of the Petition.

The Agreement further provided,

> Law Firm may demand from time to time, and client(s) shall pay such, additional sums as shall be necessary to pay said expenses. Any expense fund balance shall apply on law firm's fees; however, such balances so applied, unless hereinafter otherwise set forth, shall be considered in determining the percentages hereinafter referred to.

The Agreement provided for a contingency fee as follows: thirty percent if effected by settlement after service of notice of suit and up to the selection of the jury in said trial; thirty-three percent of the recovery if made at any point beginning with the selection of the jury and ending with the final decision of the jury; and finally, an amount equal to fifty percent thereafter, including appeal to the Washington Supreme Court if an appeal is taken.

The Agreement provided that the law firm "may at its own expense employ another attorney, or attorneys, in such place or places as may appear desirable to assist in the above matter." However, "[i]f client(s)

employ(s) another attorney, or attorneys, in this matter, such employment shall be at the client's expense."

Finally, the Agreement provided that attorneys (Muhammad) shall receive "no compensation for services rendered under this Agreement if there is no recovery of money and/or other property."

5. *Deposit of funds into personal account.* Muhammad has offered various explanations for her treatment of the $7500 check received from Peebles. At the hearing, she suggested that the fees were earned and that she did not need to put them in trust. She further stated that the check was written to her personally and that, as a result, she put it in her personal account. At another point in the hearing, and in her posttrial brief, she criticized bankers at Veridian Credit Union for improperly setting up her trust account, but the check was deposited in Muhammad's personal account at Bank of America where Muhammad had no client trust accounts. The deposit of the funds into her personal account was an intentional act: she stated at the hearing that she did so as the check was made out to her personally.

At the time the check was deposited in her personal account, there were indications that Muhammad was experiencing financial distress. In her testimony before the commission, Muhammad emphasized that she needed funds to pay her paralegal and was also overdue on at least one credit card.

6. *Events after the execution of the Agreement.* In December, after entering into the Agreement, Muhammad intended to look into yet another legal matter for Peebles, helping to collect an unpaid $78,000 backpay award related to a 2005 jury trial against the City of Seattle. Muhammad also assisted Peebles with reinstating her visitation rights with her hospitalized son and with obtaining appropriate discharge instructions for

Peebles' son. Muhammad told Peebles she would commence work on the personal injury and civil rights matter in January.

Muhammad obtained a referral for Lee Rousso to serve as local counsel in Washington state for the personal injury and civil rights lawsuit. Muhammad notified Peebles that Peebles needed to meet with Rousso in January of 2017. Peebles became very upset that it was necessary to have a Washington attorney involved.

Muhammad and Peebles disputed whether their attorney–client relationship was terminated by Muhammad or Peebles, but in any event, the relationship was terminated in February of 2017. The commission found that Muhammad did not file a personal injury or a civil rights matter on behalf of Peebles and, further, that Muhammad did not incur any expenses for the personal injury and civil rights matter.

Soon after the termination of representation, Peebles requested an accounting of the $7500 paid to Muhammad. Muhammad did not provide an accounting and (by Muhammad's own admission) did not maintain records on the work completed and time accrued regarding her work for Peebles.

7. *The $7500 was for anticipated expenses related to the personal injury/civil rights litigation.* Muhammad asserted that she and Peebles agreed Muhammad would receive $15,000 for Muhammad's work regarding the $55,000 public disclosure settlement. Muhammad claimed that the Peebles payment of $7500 was for one-half of these public disclosure settlement fees and that the $7500 included in the Agreement was "memorializing" the other half. In other words, Muhammad claimed that the $7500 was for fees already earned in the public disclosure litigation and not for future expenses in the personal injury/civil rights litigation. The facts do not support this assertion.

First, the public disclosure case was largely settled when Muhammad was engaged by Peebles. Obviously, Muhammad desired to ensure that the terms of the settlement agreement did not foreclose the proposed personal injury claim. And, Muhammad no doubt recognized that the video footage to be obtained as part of the public disclosure case could be important evidence in the personal injury/civil rights claim. Muhammad's work on the public disclosure file is consistent with furthering the civil rights/personal injury matter and does not appear to have been a separate engagement.

Second, the record simply does not support substantial work on the file that would be needed to justify a $15,000 flat fee. This would represent twenty-seven percent of the entire recovery, a very large amount for last minute document and strategy review with the attorney primarily responsible for the file. Instead, Muhammad's marginal work on the settlement of the public disclosure case was an important step in ensuring the future success of the proposed personal injury/civil rights claim and in obtaining important video evidence related to it.

Third, in late October, Muhammad presented Peebles with two invoices for $250 and $1000. At that time, Muhammad had no agreement in place with Peebles related to the personal injury/civil rights claim. Though not itemized, these billings likely reflect the work to date that Muhammad believed Peebles owed her for work she performed in the absence of a contingency fee agreement on the personal injury/civil rights matter. The record is clear, however, that these invoices were not "due" but were to be rolled into the Agreement once it was executed by Muhammad and Peebles.

Fourth, the terms of the Agreement establish that the funds were advanced for litigation expenses in the personal injury/civil rights matter.

The Agreement was signed in late November after Peebles obtained the funds from the public disclosure settlement. The terms of the Agreement clearly identify the funds as being advanced to pay for expenses in the litigation. Peebles contemporaneously put the $7500 check and a signed copy of the Agreement in the same envelope and mailed it to Muhammad. Muhammad's attempt to divorce the $7500 from the terms of the Agreement are not persuasive.

Muhammed blames her inexperience for the mismatch between the terms in the Agreement and Muhammad's stated purpose of the Agreement. The evidence shows, however, there was no rush to complete the Agreement. Muhammad had ample time to review and edit the Agreement, first finding the exemplar agreement in August of 2016. Peebles' payment of $7500 was for the specific purpose to advance money for expenses related to the personal injury and civil rights matter, pursuant to the Agreement.

Fifth, the record shows that on October 27, 2016, Peebles sent a text message to Muhammad. The text message stated, in relevant part,

> I understand that there will be expenses, as you are out of state. Will you be willing to accept $7,500 retainer for personal injury and no billing to look into the matter of the $75,000 [for the 2005 worker's compensation case] I've never received. Both cases on separate contingency.

To this, Muhammad replied, "[T]hat's fair. Let's get this show on the road." Clearly, the $7500 retainer was for expenses in the personal injury/civil rights matter and was separate from, for instance, any potential representation on the workers' compensation matter.

8. *No cumulative earned fee offset.* Aside from her theory that the $7500 was paid for fees earned as a flat fee in the public disclosure litigation, Muhammad offers an alternate theory, namely, that she

cumulatively earned $7500 in unbilled work for a number of undertakings for Peebles and that, therefore, she had a colorable earned fee offset to the $7500 she wrongfully deposited in her personal account.

But the record does not support the cumulative earned fee theory. Much of the unbilled work claimed by Muhammad in fact relates rather closely to the personal injury/civil rights claim and cannot be used as an offset as the parties agreed that fees would be paid on a contingent basis. As indicated above, the work on the public disclosure case, which likely totaled about $1000 or $1250 at most, was inextricably related to the personal injury/civil rights claim. From the record, it is clear that this work was rolled into the larger representation. Even so, the $1250 does not approach the $7500 taken by Muhammad.

Muhammad also claims she did work for Peebles on a potential workers' compensation claim. According to Muhammad, Peebles was owed $78,000 from a past workers' compensation claim. The record shows, however, that the parties contemplated that the matter, if handled at all, would be done on a contingent fee basis. No formally executed contingent fee agreement was reached by the parties in this matter. Therefore, any work performed by Muhammed did not reflect earned fees but was exploratory work related to a potential future engagement.

Muhammad points out that she did write a letter on behalf of Peebles and/or her son to medical providers. Yet, this relatively minor undertaking was related to the same personal injury/civil rights case and covered by the contingency fee representation. Even if part of the funds were earned, one must wonder why Muhammad was unable to return any portion of the $7500 fee. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Kelsen*, 855 N.W.2d 175, 184 (Iowa 2014).

We do not doubt that Peebles was a difficult client. There were no doubt an abundance of phone calls between Peebles and Muhammad's office. This fact does not provide a defense to misappropriation of client funds.

**B. Violations.** As is often the case, the central issue here is whether Muhammad converted money from her client or whether she is simply guilty of trust account violations. *See Cepican*, 861 N.W.2d at 844 ("The difference [between theft or conversion and mere trust account violations] is critical because of the difference in the sanctions imposed."). A long line of our cases over the past twenty-five years stand for the proposition that conversion of client funds almost always results in revocation of the attorney's license to practice law. *See, e.g., Iowa Supreme Ct. Att'y Disciplinary Bd. v. Guthrie*, 901 N.W.2d 493, 500 (Iowa 2017) ("[I]n nearly every case where an attorney converts client funds without a colorable future claim, we revoke the attorney's license to practice law."); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Stowe*, 830 N.W.2d 737, 742 (Iowa 2013) ("It is almost axiomatic that we revoke the licenses of attorneys *who convert funds when the attorney did not have a colorable future claim to the funds.*" (Emphasis added.)); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Nelsen*, 807 N.W.2d 259, 266 (Iowa 2011) ("It is almost axiomatic that we will revoke the license of an attorney *who converts a client's funds to his or her own use.*" (Emphasis added.)); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Williams*, 675 N.W.2d 530, 533 (Iowa 2004) ("Normally, this court will revoke an attorney's license for converting client funds."); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Lett*, 674 N.W.2d 139, 144 (Iowa 2004) ("[The attorney's] actions clearly warrant revocation . . . . [Attorney] stole client funds."); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Bell,* 650 N.W.2d 648, 655 (Iowa 2002) ("[W]e conclude

revocation is appropriate. We are fully aware this proceeding involves [the attorney's] first ethical violation. Nevertheless, in view of [the attorney's] willful and knowing misappropriation of funds to his personal use and the aggravating circumstances previously noted, disbarment is warranted."); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Leon*, 602 N.W.2d 336, 339 (Iowa 1999) (finding that even in client funds misappropriation cases meriting leniency, that if sufficient aggravating factors exist, the court has "a duty to protect the public and the courts from such conduct" through revocation); *Comm. on Prof'l Ethics & Conduct v. Ottesen*, 525 N.W.2d 865, 866 (Iowa 1994) ("There is no place in our profession for lawyers who convert funds entrusted to them."); *Comm. on Prof'l Ethics & Conduct v. Fugate*, 394 N.W.2d 408, 410 (Iowa 1986) ("We will not countenance conversion of client funds by persons we license to practice law. Our decisions consistently hold that revocation, rather than suspension, is the appropriate discipline for the commingling and conversion of client funds."). On the other hand, violation of trust account violations ordinarily lead to lesser sanctions. *See Guthrie*, 901 N.W.2d at 498 (finding misappropriation of client funds more severe than violations of ethical rules regarding client trust accounts); *Cepican*, 861 N.W.2d at 844 ("Theft of client funds is grounds for revocation, while the failure to follow the rules governing retainer fees normally results in a less severe sanction."); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Powell*, 830 N.W.2d 355, 359 (Iowa 2013) ("While the conduct in both categories is serious, . . . we make a distinction for purposes of sanctions between conduct involving trust fund violations and conduct in the nature of stealing.").

In this case, we are somewhat hampered by the state of the record and the lack of advocacy by the parties. Muhammad was prohibited from offering witnesses or evidence, and only two witnesses, Peebles and

Muhammad, were called by the Board. Under the circumstances, the documentary evidence in this case is limited.

We first consider whether Muhammad has violated Iowa Rules of Professional Conduct 32:8.4(b) and 32:8.4(c). Based on our de novo review, we agree with the commission that Peebles paid the $7500 as a retainer for legal expenses in connection with the personal injury/civil rights engagement. Muhammad deposited the fees in her personal account. Further, the personal injury/civil rights engagement never got off the ground due to a dispute over the hiring of local counsel.

At the hearing, Muhammad testified that the payment of $7500 was not for expenses related to the personal injury/civil rights litigation but instead for services performed by Muhammad in connection with the settlement of the public disclosure claim. As pointed out by the commission, the agreement drawn by Muhammad and sent by her to Peebles explicitly referenced representation in the personal injury/civil rights matter. In response, Peebles executed the agreement and made the payment of $7500 to Muhammed. The documentary record, as well as the testimony of Peebles, directly links the $7500 payment to the execution of the personal injury/civil rights contingency agreement (Agreement).

We note this case has similarities with the situation presented in *Kelsen*, 855 N.W.2d 175. In *Kelsen*, the board charged that the respondent received $7500 from a client. *Id.* at 178. Kelsen claimed that the client understood that the funds could be used, in part, to pay for Kelsen's office expenses. *Id.* at 179. The relevant contingency agreement prepared by Kelsen provided that the funds would be used for litigation expenses and had no language relating to using the funds for Kelsen's overhead. *Id.* at 179–80. Kelsen claimed that he prepared the contingency agreement from a form that he found on the internet when working at home late at night.

*Id.* at 180. Kelsen claimed that the document did not reflect the parties understanding. *Id.* at 179–80. We ultimately rejected Kelsen's contentions and revoked his license. *Id.* at 185–86.

The *Kelsen* case is instructive here. Muhammad makes a similar claim regarding lack of care in preparing a contingency fee agreement and claims there was an understanding outside the four corners of the Agreement that authorized her to claim the funds. As in *Kelsen*, Muhammad offered no evidence other than her conclusory testimony. Unlike in *Kelsen*, however, Muhammad's client (Peebles) adamantly denied Muhammad's claim that she was entitled to fees for services provided in the public disclosure action.

Muhammed claims that she could not offer documentation proving her work on the public disclosure claim because the commission, after repeated defaults, barred her from offering exhibits at the hearing. Yet, she made no offer of proof at the hearing. Further, the public disclosure claim was largely resolved when Peebles first contacted Muhammad. And, the record shows that Peebles had separate counsel (Katherine George) in connection with the public disclosure claim. It seems implausible that Muhammad earned or was otherwise entitled to a large fee of $15,000 on a matter that was largely settled when Peebles first contacted Muhammad. The commission did not credit Muhammad's explanation that the $7500 fees were earned through representation in the public disclosure matter. We share the commission's view of the evidence.

It is perhaps true that Muhammad performed some unbilled tasks for Peebles that are not directly related to the personal injury/civil rights claim. Such services are reflected in the October invoices of $250 and $1000. Based on our review of the record, however, we conclude, as did the commission, that these fees were folded into the Agreement. In any

event, even if there were some marginal fees unrelated to the personal injury/civil rights representation, they did not approach the $7500 Muhammad received from Peebles and deposited directly into Muhammad's personal bank account. *See id.* at 184–86 (holding revocation is appropriate where Kelsen similarly places $7500 directly in his personal bank account without mitigating circumstances). The bottom line is that Muhammad did not have a present claim of right that would serve as an offset for her misuse of the $7500 expense retainer.

There is, perhaps, the possibility that Muhammad could claim a future colorable claim under the Agreement. Such an understanding was not explicitly advanced by Muhammad. In her answer to the Board's complaint, Muhammad asserted only that the money was not for expenses but was earned through services Muhammad provided to Peebles in settling the public disclosure case.

The question of whether an attorney could assert a colorable future claim of work to be performed in the future was addressed in *Kelsen.* In *Kelsen*, we noted that "[w]e generally do not revoke the licenses of hourly rate attorneys who take funds for personal use before they have done the work but in anticipation of doing so." *Id.* at 185. We explored whether the same approach could be applied when the lawyer was working in a contingency fee context.

In *Kelsen*, we declined to find a colorable future claim based on work to be done on a contingent fee claim. We noted that the attorney's testimony that he expected a prompt settlement was vague and lacked corroborating detail. *Id.* There is certainly no claim in this case that settlement of the yet-to-be-filed personal injury/civil rights claim was imminent. Second, we noted in *Kelsen* that the retainer advanced was for costs and not fees. *Id.* The same is true here. Finally, we noted in *Kelsen*

the lawyer did not have a signed contingency fee agreement. *Id.* In contrast, we do have a contingency fee agreement in Muhammad's case.

We do not think the last *Kelsen* factor is determinative here. Muhammad provided no evidence that she had performed any significant work on the case prior to termination of representation or that there were near term prospects for success on the file. Under these facts, we do not find a colorable future claim based on the contingency fee contract.

The commission sought supplemental briefing from the parties on the application of this court's ruling in *Parrish*, 925 N.W.2d at 170–71. In *Parrish*, an attorney received client funds intended for expenses, but kept the money for himself. *Id.* at 167. Parrish claimed, however, that he had earned fees in excess of the amounts advanced for stenographic expenses and thus had a colorable present claim, even though the payment was expressly restricted to satisfying outstanding court reporter fees. *Id.* at 167–68. In *Parrish*, we rejected the argument that a present claim of earned fees could give rise to a colorable claim for funds advanced for expenses, but we declined to impose the severe sanction of revocation on the ground that our prior caselaw did not provide clear notice to attorneys that a present claim could not be used as a defense to misappropriation of specifically designated funds. *Id.* at 180.

If Muhammad had convinced us that she had a colorable present fee offset to the $7500 expense retainer, we might conclude, as in *Parrish*, that she was entitled to fair notice that such a theory was not a defense to a conversion claim where the funds are designated for a particular purpose. As a general matter, we think it advisable that lawyers have clear notice of the type of conduct that may lead to revocation. Like the commission, however, we have found that Muhammad simply did not have a present claim to the $7500 under any scenario.

Finally, there is the question of scienter for violation of Iowa Rule of Professional Conduct 32:8.4(c).  *See Guthrie*, 901 N.W.2d at 498 (noting the necessity of finding some level of scienter in cases of misappropriation of client funds).  Scienter is satisfied where an attorney acted knowingly, intentionally, or with the aim to mislead.  *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Ricklefs*, 844 N.W.2d 689, 698–99 (Iowa 2014).  An attorney's "casual, reckless disregard for the truth" also establishes sufficient scienter to support a violation of the rule.  *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Clarity*, 838 N.W.2d 648, 656 (Iowa 2013) (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Isaacson*, 750 N.W.2d 104, 109 (Iowa 2008)).  Based on our review of the record, we conclude that the Board showed by a convincing preponderance of the evidence that the deposit of Peebles' $7500 into Muhammad's personal account was not a mere mistake but was an intentional act.  It could well be, of course, that Muhammad did not realize the ethical implications of her conduct.  Theft by misappropriation, however, is a general intent crime.  *Eggman v. Scurr*, 311 N.W.2d 77, 79–81 (Iowa 1981).

We therefore conclude, as did the commission, that the Board has proved by a convincing preponderance of the evidence that Muhammad violated Iowa Rules of Professional Conduct 32:8.4(b) and 32:8.4(c) and that she had no colorable present or future claim offsetting her misappropriation.

**C. Sanction.**  Under the caselaw cited above, revocation of license is virtually automatic when a lawyer converts client funds.  We see no basis for an exception in this case.  As a result, we conclude that the appropriate sanction in this case is revocation.

**IV. Disposition.**

We revoke Muhammad's license to practice law in the State of Iowa. As a result, Muhammad must follow the notification provisions of Iowa Court Rule 34.24. Muhammad may apply for readmission after a period of at least five years. *See* Iowa Ct. R. 34.25(7). In the event of application for readmission, Muhammad must demonstrate she is of good moral character and worthy of readmission to the bar. *See id.* r. 34.25(9). Costs of this action are assessed to Muhammad pursuant to Iowa Court Rule 36.24(1).

**LICENSE REVOKED.**